IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>          v.<br><br>BERNARD BELLEROUCHE,<br><br>               Appellant. | No. 84887-9-I<br><br>DIVISION ONE<br><br>ORDER WITHDRAWING AND SUBSTITUTING OPINION |

The court has determined that it should withdraw the published opinion filed on March 3, 2025 and file the attached substitute published opinion primarily in order to reflect corrections in the transcriptions of some of the verbatim report of proceedings referenced in the dissent.

Now, therefore, it is hereby

ORDERED that the opinion filed on March 3, 2025 is withdrawn and a substitute published opinion shall be filed.

FOR THE COURT:

_Díaz, J._

_Coburn, J._

_Dwyer, J._

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Respondent,<br><br>   v.<br><br>BERNARD BELLEROUCHE,<br><br>     Appellant. | No. 84887-9-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

DÍAZ, J. — A jury convicted Bernard Bellerouche of assault in the first degree and unlawful possession of a firearm, for shooting Terrence Robinson three times, including once in the face. Bellerouche primarily alleges three errors occurred at trial. First, he claims the court should have excluded, under ER 403, photos of the shirt he wore at his arrest, which contained a sexually suggestive picture. Second, Bellerouche, who is African American, argues the State committed race-based prosecutorial misconduct by using the term "beef" five times during trial, largely when discussing whether he and Robinson, who is also Black, had a dispute prior to the shooting. Third, he avers that the State based its closing argument on an unreasonable inference or evidence outside the record when it claimed Robinson feared Bellerouche would "come back and finish the job." We hold there is no reversible error and affirm Bellerouche's convictions, but remand this matter to strike the victim penalty assessment and to correct a clerical error in his judgment and sentence.

# I. BACKGROUND

## A. Overview of the Shooting

On July 25, 2020, Bellerouche attended a memorial for a deceased friend. After the memorial, Bellerouche, Robinson, Solomon Egger,[1] and Dino Nguyen[2] traveled to a business plaza near the intersection of Aurora Avenue and 152nd Street. At approximately 2:30 a.m., Robinson fled from the business plaza after he was shot. Robinson suffered three gunshot wounds, including one to the face. Robinson ran to a casino across the street for help. The casino's employees called 911 and an ambulance took Robinson to the hospital.

A surveillance camera at a nearby McDonalds partially captured the incident. However, the surveillance video did not capture the shooting itself as it occurred inside Nguyen's white Audi SUV. Robinson and Bellerouche testified to vastly different accounts of the shooting. We address each.

### 1. Surveillance Video

The surveillance video's timestamp starts at 2:00 a.m. A black BMW is parked in the upper righthand corner of the video. However, only the lower half of the BMW is visible and its windows are entirely out of frame. At trial, Bellerouche testified the Black BMW belonged to him.

---

[1] At trial, Robinson and Bellerouche each testified that Egger was their friend and that he was present near the scene of the shooting. However, a detective testified that Egger died in September 2020 before authorities could locate or contact him. Additionally, the record uses both "Egger" and "Eggers." However, we utilize "Egger" as the parties' appellate briefs both use that spelling.

[2] At trial, Robinson and Bellerouche each testified that they knew Nguyen and that the shooting occurred inside Nguyen's white Audi. Bellerouche further testified that Nguyen was his friend. However, a detective testified that they were unable to locate Nguyen after the shooting.

A white Audi SUV is parked approximately one parking spot away from the BMW. Most, if not all, of the Audi is visible. Even so, it is difficult, if not impossible, to see inside of the Audi's windows. Trial testimony established that the white Audi belonged to Nguyen.

At 2:20 a.m., the Audi's driver side back door opens but is quickly closed and left slightly ajar. It is not possible to see who is inside the vehicle even when this back door is opened. Robinson testified at trial that he was in the back seat and opened the door. At 2:33:25 a.m., the Audi's driver side back door opens again and Robinson sticks his foot out. At 2:33:49 a.m., Robinson's foot suddenly jolts and he quickly runs to the left out of the video's frame after slamming the car door. At 2:33:57 a.m., the Audi then drives off to the left out of the video's frame. At 2:34:01 a.m., the BMW then drives off to the right out of the video's frame. The video ends at 2:34:20 a.m.

2. Robinson's Account

Robinson testified that he arrived at the business plaza alone sometime after midnight. Subsequently, Bellerouche, Egger, and Nguyen also arrived. Robinson said the four were "[j]ust hanging out" and consumed cognac and cocaine.

At the time of the shooting, Robinson claimed he sat in the driver's side back seat of Nguyen's white Audi, while Nguyen sat in the driver's seat and Bellerouche sat in the front passenger seat. Robinson subsequently told his stepfather, detectives, and the jury that Bellerouche shot him.

As will be discussed in more detail below, the State also asked Robinson if

3

he was "arguing with anybody" prior to the shooting. Robinson responded "I don't know." Robinson also testified that he opened the Audi's driver side back door before the shooting "[j]ust some for wild reason" (sic) and because he "was scared."

Robinson claimed he met Bellerouche in 2009 or 2010. But, Robinson indicated he never socialized with Bellerouche "one-on-one."

### 3. Bellerouche's Account

Bellerouche testified that he arrived at the business plaza around midnight with Egger and about thirty other people from the memorial. He claimed he did not remember seeing or interacting with Robinson at the business plaza. He further claimed he did not consume any drugs that night. However, he acknowledged that his fingerprints were found on a cognac bottle seen on the surveillance video and later found at the scene.

At the time of the shooting, Bellerouche claimed he sat in the front passenger seat of his BMW, while Egger sat in the driver's seat. Bellerouche further testified that, sometime before the shooting, Nguyen arrived at the business plaza in his white Audi. But, Bellerouche claimed he "wasn't really paying attention to who was in" the Audi.

At around 2:30 a.m., Bellerouche testified that Egger and he "left the parking [lot] when [they] heard something that sounded like gunshots." Bellerouche further claimed Egger later updated Bellerouche on the shooting, telling him only that Nguyen was unharmed. Bellerouche also claimed to have talked with Nguyen a "day or two later or something like that." The State then asked Bellerouche why

he did not inquire further about the shooting when he previously said Nguyen was his friend. Bellerouche responded that the "situation was just sketchy" and he "didn't want to get involved."

The State asked Bellerouche if he had ever previously spoken with Robinson and Bellerouche responded "[n]o, not necessarily, no." Bellerouche further testified he was unaware that Robinson had been shot until his arrest in December 2020.

B.      Overview of the Investigation as Testified at Trial

At trial, detectives testified as to Robinson's initial reluctance to cooperate. Robinson refused to speak with a detective at the hospital on the day of the shooting and "wasn't really forthcoming with a lot of information" at their first meeting in July 2020.

Further, and as acknowledged by the State, Robinson made statements on the day of the shooting that were inconsistent with his later identification of Bellerouche as the shooter. For example, the State's opening argument acknowledged Robinson "told the patrol officer that a bluish car . . . pulled up on me and somebody inside that car shot me" but that the surveillance video would instead show Robinson "was shot inside the white Audi." The State further acknowledged that Robinson told first responders that "he did not get a good look at who shot him" even though the video and testimony would indicate Robinson "had been in that car for 24 minutes before Bellerouche shot him."

Ultimately, the State presented unrebutted testimony that Robinson identified Bellerouche as the shooter at three different times. On the day of the

shooting, Robinson told his stepfather at the hospital that "Crucial" shot him. The stepfather passed this nickname on to detectives. Later on at trial, Bellerouche stipulated that "Crucial" is his nickname.

At their initial interview in July 2020, detectives offered to show Robinson a photo montage that contained a photo of Bellerouche. Robinson refused to look at the montage. Instead, Robinson said "I'll do you one better" and showed detectives a photo of Bellerouche on his phone. The detective recognized the photo as Bellerouche as it was the same photo used in the montage. Still, Robinson did not give detectives a name with the photo.

In August 2020, Robinson met with detectives again. Once again, the detectives sought to show Robinson a photo montage that contained a photo of Bellerouche. A detective testified that Robinson "seemed unwilling to look at it" and he "didn't want to or was unwilling to make an identification." Instead, Robinson "said something, in essence, 'I showed you the photo before,' and that was it." Robinson did, however, tell detectives that "Crucial" shot him.

C.      Procedural History and Trial

In October 2020, the State charged Bellerouche with assault in the first degree and unlawful possession of a firearm in the first degree. In December 2020, the police arrested Bellerouche at a home in Arizona.

A ten-day jury trial began in September 2022. Robinson testified he was shot by the "passenger in the white truck," referring to the white Audi SUV. Robinson also picked Bellerouche's photo from a montage in front of the jury.

In October 2023, the jury found Bellerouche guilty as charged. The court

sentenced Bellerouche to 249 months of incarceration. Bellerouche timely appeals.

## II. ANALYSIS

### A. Admissibility of Shirt Photos Under ER 403

Bellerouche argues that the court abused its discretion under ER 403 by admitting over his objection "marginally relevant" but "powerfully inflammatory" photographs of the shirt Bellerouche wore during his arrest. As described by Bellerouche, the shirt depicted a "woman's bare bottom with the sexual innuendo 'Hennything Is Possible Tonight.'" We hold Bellerouche did not carry his burden to show the court abused its considerable discretion in admitting the photo and, even if it did, we conclude that the error was harmless.

#### 1. Additional Facts

Outside the presence of the jury, Bellerouche's trial counsel moved to exclude the shirt photos from the December 2020 arrest. His counsel expressed concern that the "State is trying to make a connection that because Mr. Bellerouche is wearing a Hennessy, entirely different brand of cognac, t-shirt that therefore, he is more likely to have committed this crime or be connected to this crime because a cognac bottle was" found at the scene, which was "an incredibly attenuated argument." In other words, his counsel argued under ER 403 that the photos' "incredibly minimal" probative value was "deeply outweighed by presenting Mr. Bellerouche in a shirt with an exposed woman's bottom in it."[3]

---

[3] On appeal, the State avers that Bellerouche improperly "argues for the first time on appeal that the exhibit was unfairly prejudicial because it amounted to a 'comment' on his 'apparent lifestyle.'" Even assuming arguendo Bellerouche failed

The State responded in part that Robinson had testified that Bellerouche was drinking cognac the night of this shooting and the "fact that Mr. Bellerouche is later arrested wearing a cognac t-shirt . . . makes it more likely that that Robinson's testimony on the matter is credible."

The court denied Bellerouche's motion, explaining that "it is relevant the fact that Hennessy, a cognac bottle was found at the scene . . . and Bellerouche was photographed with a Hennessy shirt." The court acknowledged that "there's prejudice by the fact that the shirt can be potentially considered by the jury as crude," but found that "the probative value in this instance outweighs the danger of any unfair prejudice."

The court admitted the shirt photos after the State laid further foundation. During its cross examination, the State asked Bellerouche if he drank cognac at the scene of the shooting and if he wore a Hennessy branded shirt when he was arrested. Bellerouche responded affirmatively to both questions. There were no questions related to the image on the shirt.

2. Discussion

    a. Relevance

In general, "[a]ll relevant evidence is admissible." ER 402. Evidence is relevant "if it makes the existence of a fact of consequence more or less probable to be true than without the evidence." State v. Arredondo, 188 Wn.2d 244, 259, 394 P.3d 348 (2017); ER 401. Further, this court has held that "[w]hen the identity

---

to fully flesh out this argument below, we exercise our discretion to consider it as presented here. RAP 2.5(a).

of the perpetrator of a crime is at issue, any evidence tending to identify the accused as the guilty person is relevant." State v. Sellers, 39 Wn. App. 799, 805, 695 P.2d 1014 (1985); see also State v. Huber, 129 Wn. App. 499, 501-02, 119 P.3d 388 (2005). In sum, "[t]he threshold to admit relevant evidence is very low" and "[e]ven minimally relevant evidence is admissible." State v. Darden, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002).

"This court reviews a trial court's evidentiary rulings for abuse of discretion." In re Pers. Restraint of Quintero, 29 Wn. App. 2d 254, 290, 541 P.3d 1007 (2024). "A reviewing court may not find abuse of discretion simply because it would have decided the case differently—it must be convinced that '*no reasonable person* would take the view adopted by the trial court.'" State v. Salgado-Mendoza, 189 Wn.2d 420, 427, 403 P.3d 45 (2017) (internal quotation marks omitted) (quoting State v. Perez-Cervantes, 141 Wn.2d 468, 475, 6 P.3d 1160 (2000)).

Bellerouche concedes the photographs were relevant but asserts that they were "only marginally relevant." He argues that there was only a "tenuous" connection between him drinking a Remy Martin cognac bottle on the night of the shooting and him wearing a Hennessey cognac shirt over four months later.

While this may be true as far as it goes, we hold that the court did not abuse its discretion in finding the shirt photos were at least somewhat relevant and, thus without more, admissible. Darden, 145 Wn.2d at 621. The shirt Bellerouche wore in the photos references a brand of cognac and a cognac bottle was found at the scene. The shirt photos, thus, make it at least somewhat more probable that Bellerouche was at the scene of the shooting, clearly a relevant fact, even if not

contested. Arredondo, 188 Wn.2d at 259. Further, Robinson testified that he saw Bellerouche drinking cognac, and, thus, the shirt photos have some tendency to bolster Robinson's credibility, a fact relevant to Bellerouche's culpability. Sellers, 39 Wn. App. at 805. Bellerouche fails to establish the court's finding that the evidence is simply relevant is one "no reasonable person" would take. Salgado-Mendoza, 189 Wn.2d at 427.

   b. Substantially Outweighed by Prejudice

The next question is whether this relevant evidence "is substantially outweighed by the danger of unfair prejudice." ER 403.[4] "Evidence causes unfair prejudice when it is 'more likely to arouse an emotional response than a rational decision by the jury.'" City of Auburn v. Hedlund, 165 Wn.2d 645, 654, 201 P.3d 315 (2009) (internal quotation marks omitted) (quoting State v. Cronin, 142 Wn.2d 568, 584, 14 P.3d 752 (2000)). And "the burden of demonstrating unfair prejudice is on the party seeking to exclude the evidence," here, Bellerouche. State v. Burkins, 94 Wn. App. 677, 692, 973 P.2d 15 (1999).

The "linchpin word is 'unfair'" and the court must "weigh the evidence in the context of the trial itself." State. v. Bernson, 40 Wn. App. 729, 736, 700 P.2d 758 (1985). As such, an ER 403 analysis "should consider the availability of other means of proof" among other factors. State v. McCreven, 170 Wn. App. 444, 457, 284 P.3d 793 (2012).

---

[4] ER 403 includes many ways in which the probative value of relevant evidence may be outweighed by other considerations, including the "needless presentation of cumulative evidence." Bellerouche assigns error only to the danger of unfair prejudice.

The superior court's "balancing of probative value against its prejudicial effect or potential to mislead under ER 403 with a great deal of deference, using a 'manifest abuse of discretion' standard of review." State v. Luvene, 127 Wn.2d 690, 707, 903 P.2d 960 (1995) (quoting State v. Russell, 125 Wn.2d 24, 78, 882 P.2d 747 (1994)). A manifest abuse of discretion occurs when "'the trial court's exercise of discretion is manifestly unreasonable or based upon untenable grounds or reasons.'" State v. Case, 13 Wn. App. 2d 657, 668, 466 P.3d 799 (2020) (internal quotation marks omitted) (quoting State v. Lile, 188 Wn.2d 766, 782, 398 P.3d 1052 (2017)).

We hold that Bellerouche has not carried his burden to show a manifest abuse of discretion. The court accurately described the shirt as "crude." It unnecessarily then found that "the probative value . . . outweighs the danger of any unfair prejudice." That is not the test. Bellerouche has to show, now on appeal, that the unfair prejudice "substantially" outweighs the probative value of this relevant evidence, a higher standard. ER 403.

Bellerouche's trial counsel's sole argument was that the State was "asking for the jury to draw" inferences and ask "hypotheticals," such as "why someone buys the shirt, why someone wears the shirt, what that means." On appeal, Bellerouche avers that these photos "amounted to a prejudicial comment on Mr. Bellerouche's apparent lifestyle that alienated him from the jury" as it "recalls offensive stereotypes of a misogynistic 'gangster' or 'thug'" and "easily trigger jurors' unconscious racial biases."

We hold that these arguments are based on questionable leaps of logic. It

is unclear to us how a singular image on a "cheesy" shirt, which Bellerouche happened to be wearing on the day of his arrest, would "manifestly" cause the jurors to engage in such speculation and alienation, such that it "arouse[s] an emotional" rather than "a rational decision by the jury," when considering his guilt and freedom, let alone clearly cause the jury to sit in judgment of his entire lifestyle. Luvene, 127 Wn.2d at 707; Hedlund, 165 Wn.2d at 654. That is a stretch.

Moreover, it is unclear to us how the picture of the shirt is "unfair," when again it simply happens to be the lightly embarrassing shirt Bellerouche happened to choose to wear the day he happened to be arrested. Bernson, 40 Wn. App. at 736. The putative unfairness cannot come from the fact that he was wearing a shirt advertising alcohol or that he drinks such alcohol (as he testified to both), but only that the photos contained a singular sexually suggestive image on it. McCreven, 170 Wn. App. at 457.

We hold that Bellerouche has not shown, as is his burden, that that image creates an unfairness that *substantially* outweighs the marginal probative value of the connection between the shirt and either Bellerouche's presence at the scene or Robinson's credibility. Thus, under the "great deal of deference" afforded to such decisions, we do not find reversible error. Luvene, 127 Wn.2d at 707.

c. Harmlessness

Even assuming arguendo that the court erred in balancing the probative value and prejudicial effect of the photos, an "[e]videntiary error is grounds for reversal only if it results in prejudice." State v. Neal, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001). "An error is prejudicial if, 'within reasonable probabilities, had the

error not occurred, the outcome of the trial would have been materially affected.'" Id. (quoting State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)). Further, "[i]mproper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the evidence as a whole." Id.; see also State v. Pirtle, 127 Wn.2d 628, 653, 904 P.2d 245 (1995) ("In light of the gruesome photos of the victims that were also before the jury, it cannot be said that the 'in-life' photos could have added much additional prejudice.").

Bellerouche argues the photographs of his shirt were "powerfully inflammatory" due to the shirt's "depict[ion of] a woman's bare bottom with the sexual innuendo 'Hennything Is Possible Tonight.'" He reasons the case essentially "boiled down to Mr. Bellerouche's word against Mr. Robinson's" and the "inflammatory, unnecessary photographs put a proverbial thumb on the prosecution's scale."

In support, Bellerouche analogizes to State v. Salas, 1 Wn. App. 2d 931, 408 P.3d 383 (2018). There, the State showed the jury a PowerPoint slide comparing a photo of the defendant to that of the victim. Id. at 941. The victim's photo showed him "at an amusement park . . . crouched down, smiling, surrounded by three people dressed in cartoon costumes." Id. Further, the photo's caption read "'Band leader, saxophone player, customer service representative.'" Id. "Juxtaposed with this photograph is a grim image of Salas's face cropped from his driver's license." Id. The photo's caption reads "'Football player, fighter, outdoorsman.'" Id.

This court held that the photos improperly "evoke[d] high school

stereotypes" and "made the visual point that [the defendant] was dangerous, while [the victim] was meek." Id. at 945, 947. The court further likened the photo comparison to the problematic usage of a "booking photo in Walker" which was "shown alongside a smiling picture of the victim." Id. at 945 (citing State v. Walker, 182 Wn.2d 463, 474, 341 P.3d 976 (2015)). Further, this court observed that "[v]isual arguments 'manipulate audiences by harnessing rapid and unconscious or emotional reasoning process and by exploiting the fact that we do not generally question the rapid conclusions we reach based on visually presented information.'" Id. at 946 (internal quotation marks omitted) (quoting In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 708, 286 P.3d 673 (2012)). And we held that the "risk of swaying a jury through use of prejudicial imagery is perhaps highest during closing argument, when jurors may be particularly aware of, and susceptible to, the arguments presented." Id. at 947.

The present appeal is distinguishable from Salas. Here, there was no juxtaposition with Robinson in the picture, evoking sympathy or preferences for the victim. There, the photos played a much more central role as they were prominently displayed during the State's closing argument. Id. at 941. Here, the shirt photos were only briefly referenced by the State in front of the jury when questioning a detective and Bellerouche. There was no lingering on nor questions about the sexually suggestive image on the shirt, and the photos were not displayed and the shirt was not referenced at closing argument all. In sum, even if we were to hold that the image here is somehow similar to the juxtaposed, subconsciously manipulative photos in Salas simply for being a photo, the State

14

here did not utilize or emphasize the shirt photos in the same manner as Salas, thus eliminating any analogous material effect on the outcome of the trial, i.e., its prejudice. Smith, 106 Wn.2d at 780.

Equally importantly, Bellerouche's jury had numerous additional pieces of evidence, first, to gauge the credibility of Bellerouche versus Robinson's. For example, the jury heard testimony on Robinson's initial reluctance to cooperate with authorities. The jury also heard testimony and argument on Robinson's statements that were inconsistent with his later identification of Bellerouche. The jury also heard Robinson's testimony that he, and Bellerouche, consumed cognac and, indeed, cocaine the night of the shooting. Bellerouche also asserted that cell phone location data supported his testimony that he left the scene with Egger. The jury also heard, and thus could evaluate, Bellerouche's explanations for why he did not attempt to contact his friend Nguyen for days after the shooting. In other words, the jury had ample evidence other than the shirt photos to assess Bellerouche's word against Robinson's.

Finally, we cannot hold that it is "within reasonable probabilities," that, had the arguendo "error not occurred, the outcome of the trial would have been materially affected." Neal, 144 Wn.2d at 611. The victim reported at three different times prior to trial and testified at trial, albeit reluctantly, that Bellerouche shot him in the face. A shirt with a picture of a bare bottom is nothing if not of "minor significance" in that context. Id. We find it hard to believe, even in a "credibility contest," as Bellerouche describes the central issue, that a jury of Bellerouche's peers would convict him of such a serious crime because of a shirt.

15

Thus, in the context of the entire trial, Bellerouche has failed to establish it is likely the photos, even if wrongly admitted, prejudiced him. Bernson, 40 Wn. App. 729; Neal, 144 Wn.2d at 611 (quoting Smith, 106 Wn.2d at 780).

B.    State's Usage of the Term "Beef"

The State used the term "beef" five times during trial when exploring whether Bellerouche and Robinson (or others) had a disagreement. Bellerouche argues that such use of "the racially coded" term "'beef' to characterize argument between young Black men . . . evoked harmful stereotypes of Black men engaged in indiscriminate gun violence, suggesting Mr. Bellerouche was more likely to have shot Mr. Robinson because of his race." We disagree.

1. Additional Facts

The State used the term "beef" the following five times during trial.[5]  First, near the beginning of the State's opening statement, it claimed "Robinson was unsuspecting.  There had been no argument.  *There was no beef.*  Suddenly without provocation . . . Crucial [i.e., Bellerouche] turned on [Robinson] pulled the gun and shot him.  Pointblank." (Emphasis added.)

Second, during the State's direct examination of Robinson, it asked if he "ha[d] *any beef* with . . . Eggers [*sic*] ?" (Emphasis added.)  Robinson responded "[n]ot at all."   Similarly, the State then asked Robinson if he had "*any beef* or any argument with Crucial?" (Emphasis added.)  Robinson responded "[n]o."

Fourth, during the State's cross examination of Bellerouche, it asked if he

---

[5] The State also used the term "beef" a sixth time.  However, this reference is irrelevant as it referred to a "Mongolian beef" dish at a restaurant near the scene of the shooting.

"ha[d] any arguments with [Nguyen, Egger, or Robinson] on or about July 25th and July 26th, 2020?" Bellerouche responded "[n]o." The State then asked "*[a]ny beef with any of them?*" (Emphasis added.) Bellerouche again responded "[n]o." The State additionally asked if he "ha[d] any arguments with anybody else who was present that night at the parking lot outside the Chinese restaurant?" Bellerouche again responded "[n]o."

Finally, the State claimed during its closing argument that "[Robinson] was correct, there were no arguments, *no beefs* between anybody at that parking lot that Mr. Bellerouche knew about." (Emphasis added.) The State made this remark within a list of "the many things that [Robinson] testified to about Crucial" and the shooting itself.

## 2. Discussion

A prosecutor serves "as the representative of the people" and "[d]efendants are among the people the prosecutor represents." State v. Monday, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). Thus, the State "owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated." Id. The State violates a defendant's "right to an impartial jury when the prosecutor resorts to racist argument and appeals to racial stereotypes or racial bias to achieve convictions." Id. (citing CONST. art. I, § 22).

When a defendant claims race-based prosecutorial misconduct, Washington courts apply the objective observer test. State v. Bagby, 200 Wn.2d 777, 792-93, 522 P.3d 982 (2023). Under this test, courts must determine whether the State "flagrantly or apparently intentionally appealed to jurors' potential racial

bias" in the sense that "an objective observer *could* view the prosecutor's questions and comments as an appeal to jurors' potential prejudice, bias, or stereotypes in a manner that undermined the defendant's credibility or the presumption of innocence."[6] Id. at 793 (emphasis added); Henderson v. Thompson, 200 Wn.2d 417, 438-39, 518 P.3d 1011 (2022) (same). The State's "subjective intent is not considered in race-based prosecutorial misconduct claims." Bagby, 200 Wn.2d at 791. Further, the court considers "the context of the trial as a whole." State v. Roberts, 32 Wn. App. 2d 571, 607, 553 P.3d 1122 (2024).

We also assume an objective observer "is aware of the history of race and ethnic discrimination in the United States and that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury

---

[6] We agree with our esteemed colleague in dissent that the term "could" does not mean always. Dissent at 31, n. 28 (citing Simbulan v. Nw. Hosp. & Med. Ctr., 32 Wn. App. 2d 164, 177, 183, 555 P.3d 455 (2024)). And, instead, the term "could" means "reasonable possibility." Id. (citing Al Hayek v. Miles, No. 39989-3-III, slip op. at 9 (Wash. Ct. App. Jan. 30, 2025), https://www.courts.wa.gov/opinions/pdf/399893_pub.pdf; see also State v. Phillips, No. 39857-9-III (Wash. Ct. App. Jan. 30, 2025), https://www.courts.wa.gov/opinions/pdf/398579_pub.pdf. That is the standard we are applying. We are not demanding that the term "beef" "'unmistakably or exclusively,' or even likely, has a racial connotation," as the dissent accuses the majority of doing. Dissent at 31. But it is worth repeating that mere conceivability or theoretical possibility is not the standard. Simbulan, 32 Wn. App. 2d at 176-77 (distinguishing "possible" from "probable") ((quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 323 (2002)); see also WEBSTER'S THIRD INTERNATIONAL DICTIONARY 1771 (2002) (defining "possible" as "falling within the bounds of what may be . . . conceived"); BLACK'S LAW DICTIONARY 1410 (12th ed. 2024) (defining "possibility" as a "quality, state, or condition of being conceivable in theory"). And, respectfully, the dissent's analysis at key points strays into theoretical possibility. See, e.g., Dissent at 36 (". . . use of 'beef' could have primed jurors to pay more attention, even subconsciously, to Bellerouche's race"), 40 (the fact that the victim was black "does not negate the reasonable possibility that the prosecutor's racially-coded language *could* have also impacted jurors' decision-making processes as to Bellerouche's guilt").

verdicts in Washington State." Id. at 801. Further, "courts must account for the unique nature of implicit bias" and the inherent challenge of gauging implicit bias. State v. Berhe, 193 Wn.2d 647, 663, 444 P.3d 1172 (2019). After all, "[n]ot all appeals to racial prejudice are blatant" and "a careful word here and there can trigger racial bias." Monday, 171 Wn.2d at 678.

To make such a determination, our Supreme Court directs us to "consider (1) the content and subject of the questions and comments, (2) the frequency of the remarks, (3) the apparent purpose of the statements, and (4) whether the comments were based on evidence or reasonable inferences in the record." Bagby, 200 Wn.2d at 794. We address each factor in turn.

a. Content and Subject of the State's Questions and Comments

Our Supreme Court observed in Bagby that "[c]oded language often involves themes or euphemisms that evoke a conception of 'us' versus 'them.'" 200 Wn.2d at 794 (quoting Praatika Prasad, Note, *Implicit Racial Biases in Prosecutorial Summations: Proposing an Integrated Response*, 86 FORDHAM L. REV. 3091, 3101 (2018)). This "othering" "'highlight[s] the difference between the jurors and Black defendants' and suggest[s] that Black defendants are inherently different from white jurors and deserve less sympathy." Id.

In Bagby, the State called "attention to Bagby's 'nationality,'" and "played into a stereotype that to be American is to be white and to be Black is somehow 'foreign.'" Id. at 795 (citing Claire Jean Kim, *President Obama and the Polymorphous "Other" in U.S. Political Discourse*, 18 ASIAN AM. L.J. 165, 168, 170 (2011)). Additionally, the State's "use of racial identifiers and frequent

19

juxtapositioning of Black versus white further drew attention to Bagby's race as a factor in the trial." Id. at 796.

The State's questions and comments in Bagby, and other similar cases, pertained to content or referred to subjects that clearly invoked racial biases. Id. at 795-96; Monday, 171 Wn.2d at 678-79 (State referenced the "'no snitching' movement" and "referr[ed] to 'police' as 'po-leese'"); State v. Ibarra-Erives, 23 Wn. App. 2d 596, 606, 516 P.3d 1246 (2022) ("'Mexican ounce'"); State v. McKenzie, 21 Wn. App. 2d 722, 723, 508 P.3d 205 (2022) ("The only purpose served by referencing the gorilla pimp concept was to tap into deep-seated racial prejudice"); State v. Zamora, 199 Wn.2d 698, 703, 512 P.3d 512 (2022) (State referenced a "'drug bust down at Nogales'" as well as "border security, illegal immigration, undocumented immigrants, and drug smuggling."); State v. Loughbom, 196 Wn.2d 64, 67, 470 P.3d 499 (2020) (invocation of the "'war on drugs'").

Here, Bellerouche argues that "beef" "is frequently used by Black hip-hop and rap artists, and connotes violence, gun violence in particular." Bellerouche cites to two sources in support of his understanding of the meaning of this term: (a) non-standard dictionaries and (b) scholarly sources, news articles, and rap lyrics, which he claims define the term's meaning in popular culture. We address each in turn.

Bellerouche relies on the online Urban Dictionary, Wiktionary, and the etymology within the Oxford English Dictionary in asking us to understand the term "beef" as an "argument between two young Black men."[7]

_____

[7] At oral argument, this court asked Bellerouche's appellate counsel which of these

Although in a slightly different context, we have long urged courts to avail themselves of and to utilize, not just any resource, but a "standard dictionary" when seeking to understand an undefined term. State v. Watson, 146 Wn.2d 947, 954, 51 P.3d 66 (2002). Bellerouche's citations are not to the standard dictionaries we have relied on in the past to define a term. See, e.g., State v. Gonzalez, 168 Wn.2d 256, 263-64, 226 P.3d 131 (2010) (citing WEBSTER'S THIRD INTERNATIONAL DICTIONARY); State v. Hammock,154 Wn. App. 630, 635, 226 P.3d 154 (2010) (same); State v. Myles, 127 Wn.2d 807, 813, 903 P.2d 979 (1995) (same). Using a standard dictionary, the meaning of the term "beef" is simply slang for a "grievance or ground for complaint" without any racialized sense of the word. WEBSTER'S THIRD INTERNATIONAL DICTIONARY 196 (2002).[8] The State cites to Webster's and it is hardly "cherry picking" dictionaries, as Bellerouche asserts to rely on that dictionary rather than the many found in the recesses of the Internet to understand the meaning or content of the term.

At oral argument, Bellerouche's counsel "absolutely acknowledge[d] that 'beef' has gained much wider usage," but averred that "we still have to be careful

sources, if any, we should rely on as "standard dictionaries." State v. Bellerouche, No. 84887-9-I (Sept. 13, 2023), at 1 min., 35 sec. through 1 min., 48 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024091211/?eventID=2024091211. His counsel responded, "certainly the OED." Id. at 1 min., 48 sec. through 1 min., 51 sec.

[8] The Oxford English Dictionary's (OED) primary definition of "beef" similarly is "[a] complaint, a grievance; a protest." OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/beef_n2 (last visited Nov. 11, 2024). Even if we were to avail ourselves, not of its definition, but of the OED's famous etymology, the historical sources of that primary definition originated in late 1890's and continued through this decade, also without any reference to a racialized connotation.

21

with colloquialisms." Wash. Ct. of Appeals oral argument, State v. Bellerouche, No. 84887-9-I (Sept. 13, 2023), at 20 min., 33 sec. through 20 min., 42 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024091211/?eventID=2024091211.  It is true that prosecutors should be careful with colloquialisms, but we should assess the words prosecutors use—in the first instance and when necessary—by reference to the general meaning of the term found in a standard dictionary, particularly when a term is widely used.[9]

As to his citations in support of the pop culture definition, Bellerouche avers that "the late rapper Notorious B.I.G., who was himself a victim of gun violence," wrote a song containing numerous references to the term "beef."  Bellerouche also cites to "Lil Wayne," who also wrote a rap song that references "beef."  And Bellerouche cites to a law review article and a newspaper analyzing such references.

Our Supreme Court in Bagby, however, appeared to caution against determining a word's meaning through pop culture references.  200 Wn.2d at 804, 808 (Stephens, J., concurring).  There, five justices disagreed with the main opinion's argument that the State "prim[ed] the jury to think of Michael Vick and associate Bagby with animal abuse."  Id. at 804 (Stephens, J., concurring).  We

---

[9] The dissent accuses the majority of "limit[ing] review of a prosecutor's rhetoric within the bounds of standard dictionaries."  Dissent at 30.  We do no such thing. It is Bellerouche who attempts to ground the meaning of "beef" in a dictionary of some kind.  When assessing this first factor ("content and subject"), we agree with Bellerouche than meaning matters, but caution against cherry-picking a definition from random dictionaries or other questionable sources.

likewise should be wary then about effectively searching the Internet for a term and deriving meaning from the various hits that appear. A standard dictionary is a better to place to start. Watson, 146 Wn.2d at 954.

At a minimum, this exercise shows that, unlike the terms or phrases utilized in cases like Monday, 171 Wn.2d at 678-79, Ibarra-Erives, 23 Wn. App. 2d at 606, or Zamora, 199 Wn.2d at 703, a racial meaning is not unmistakably or exclusively tied to the term "beef." In other words, we hold that the term "beef" does not have a clear racial connotation to an objective observer, absent additional context.

As to that context, we are cognizant that facially neutral terms can become suspect depending on the context of their usage. For example, our Supreme Court reversed a civil case because of "defense counsel's reli[ance] on racist stereotypes about Black people and us-versus-them descriptions to undermine the credibility of Henderson and her witnesses." Henderson, 200 Wn.2d at 437. There, "defense counsel repeatedly characterized Henderson as 'combative' and confrontational'" which "evoke the harmful stereotype of an 'angry Black woman.'" Id. at 436. In contrast, the defendant characterized themselves "as 'rightly' 'intimidated' and emotional' which "invited the jury to make decisions on improper bases like prejudice or biases about race aggression and victimhood." Id. at 436-37.

Additionally, Henderson involved a defendant who "was a white woman. The judge was a white woman, and there were no Black jurors. The only Black people in the courtroom were Henderson, her attorney and her lay witnesses." Id. at 423.

In this matter, in contrast, the State's use of the term "beef" did not juxtapose

one side to another to create the appearance of an "us-versus-them" narrative, as seen in Henderson, 200 Wn.2d at 437, and Bagby, 200 Wn.2d at 794. Here, the State asked *both* Robinson and Bellerouche whether any "beef" preceded the shooting. The State further used the term "beef" at opening and closing arguments, but did so to emphasize how *both* Bellerouche and Robinson claimed there was no argument or animosity preceding the shooting. In other words, the context of the State's usage of "beef" would not indicate to an objective observer that there could be an apparent intent to contrast one side to another. Bagby, 200 Wn.2d at 792-93.

Moreover, while none of the jurors in Bellerouche's trial identified as Black, both Robinson and Bellerouche were Black, as was the trial judge. Unlike in Bagby then, it would be incoherent here to conclude that the term was used to "suggest that Black defendants are inherently different from white jurors and deserve less sympathy." 200 Wn.2d at 794. To do so would have deprived the victim and the presiding judge of their humanity as well. If dehumanizing every black person in the courtroom had been the apparent intent, the lack of an objection would be perplexing. See State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990) (lack of objection "strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial").[10]

Thus, we are unconvinced that the first Bagby factor favors Bellerouche's

---

[10] The dissent is "profoundly trouble[ed]" by the "indirect implication" that this opinion will permit "racism in moderation." Dissent at 40, n. 39. Nothing in the preceding three paragraphs would sanction such a thing. There simply are facts in the limited precedent we cite that are not present here.

claim that an objective observer would view the State's "questions and comments as an appeal to jurors' potential prejudice." Bagby, 200 Wn.2d at 793.

      b. Frequency

The second Bagby factor concerns "the frequency of the remarks." Id. at 793. There, the prosecutor "asked nearly every witness about Bagby's nationality." Id. at 795. In other words, the prosecutor "questioned witnesses about Bagby's 'nationality' at least half a dozen times" and "also asked the witnesses to identify [the defendant] and other witnesses by their race over a dozen times." Id. at 796. Euphemistically, it "was not an isolated incident." Id. at 796.

In Henderson, the defense repeatedly invoked the plaintiff's race. 200 Wn.2d at 424-26, 436-38. The defense's invocations took many forms, such as directly comparing and contrasting defendant and plaintiff, accusing the plaintiff of being only motivated by money, and additionally describing the plaintiff's witnesses as "'inherently biased.'" Id.

That said, our Supreme Court also has found misconduct when the State "referenced the war on drugs three times." Loughbom, 196 Wn.2d at 68. As such, a relatively small number of references is not necessarily determinative of whether there is race-based misconduct. The placement and deployment of the challenged language matters. Loughbom was a one-day trial in which the State's "invocation of the war on drugs [in its opening statement and twice in its closing argument] was a thematic narrative designed to appeal to a broader social cause." 196 Wn.2d at 70.

Here, the State used the term "beef" five relevant times in a 10-day trial.

While the State's usage was spread out over those 10 days, each usage of the term beef focused, not on the State's trial theme, but on a major weakness of the State's case, the apparent lack of a motive for the shooting. The use of the term "beef" did not, as in Loughbom, constitute "improper framing of [the] prosecution as representing" something entirely tangential to the jury's charge, there, the war on drugs. 196 Wn.2d at 75 (emphasis omitted). The term "beef" did no framing of any kind and played no role in the State's theory of the case.

In short, even if the term's content and subject were improper, we are unconvinced that the second Bagby factor favors Bellerouche's claim that an objective observer could view the State's "questions and comments as an appeal to jurors' potential prejudice." Bagby, 200 Wn.2d at 793.

c. Apparent Purpose

The third Bagby factor considers the "the apparent purpose of the statements." Id. To be clear, "a race-neutral alternative explanation does not excuse the effect of language that appeals to racial bias." Henderson, 200 Wn.2d at 439. The State's subjective intent is also irrelevant. Bagby, 200 Wn.2d at 791. Instead, we must discern how an objective observer could "understand" the purpose of the State's conduct. Id. at 796.

To illustrate, our Supreme Court in Bagby held that "the State's use of the term 'nationality' can be understood *only* as a way to emphasize Bagby's race." Id. (emphasis added). In Henderson, defense counsel repeatedly "relied on racist stereotypes about Black people and us-versus-them descriptions to undermine the credibility of Henderson and her witnesses." 200 Wn.2d at 437. There was no

other purpose in those cases but appeals to racial prejudices.

In contrast, this court has previously held that this factor weighed in favor of the State when "the prosecutor's apparent purpose for eliciting the testimony was to show that [the defendant] was describing the circumstances of the burglary in his music video and rap lyrics," which "seemed to contradict the defense theory." Roberts, 32 Wn. App. 2d at 607.

This case is much closer to Roberts than Bagby or Henderson. The State's use of the term "beef," e.g., in its examination of Robinson and Bellerouche, was to determine the circumstances surrounding and prior to the shooting. Before asking Robinson about his potential "beef" with Bellerouche and others, the State asked about his familiarity with the scene of the shooting and the general state of his relationships with Egger and Bellerouche. The State then went through a step-by-step inquiry of the shooting itself. Similarly, the State asked Bellerouche about any possible "beef" with Robinson, contemporaneously to showing him the surveillance video and asking about his actions after the shooting. We hold that an objective observer could only find that the purpose of the term "beef" was simply part of establishing the "circumstances of the [crime]," as in Roberts, 32 Wn. App. 2d at 607.

In turn, we are unconvinced that the third Bagby factor favors Bellerouche's claim that an objective observer could view the State's "questions and comments as an appeal to jurors' potential prejudice." Bagby, 200 Wn.2d at 793.

d. Basis in Evidence

The fourth Bagby factor concerns "whether the comments were based on

27

evidence or reasonable inferences in the record." Id. at 793. In Bagby's case, his "citizenship had *absolutely nothing* to do with the crimes he was charged with or the facts of the case." Id. at 797 (emphasis added). In so holding, the Court rejected the State's argument that the questions "about Bagby's race was to help witnesses identify participants" because "Bagby's identity was not at issue in this case" as "he did not deny that he was the person involved" and because "the only issue at trial was whether his actions constituted a crime." Id. In other words, the State's remarks were made "not to prove a relevant fact nor [were] based on evidence in the record." Id.

Here, the State's use of the term "beef," e.g., in its opening statement and closing argument derived directly from its examination of Robinson and Bellerouche. This court recently denied a race-based assignment of error, in part, because the "few isolated instances" of the putatively offending term were "directly tied to [the parties'] testimony and relevant to the case." Simbulan v. Nw. Hosp. & Med. Ctr., 32 Wn. App. 2d 164, 186, 555 P.3d 455 (2024). The present appeal is much closer to Simbulan than Bagby, where the State's questions had "absolutely nothing" to do with the charges. 200 Wn.2d at 797. Had Robinson admitted he had a "beef" with Bellerouche, the jury could have interpreted that as bias, which is "always relevant." State v Orn, 197 Wn.2d 343, 353, 482 P.3d 913 (2021). Or, had Bellerouche admitted he had a "beef" with Robinson, that fact could have bolstered the State's case by establishing a motive. And the fact that there was no underlying disagreement is tied to the actual testimony of these key witnesses.

As such, we are unconvinced that the final Bagby factor favors

Bellerouche's claim that an objective observer could view the State's "questions and comments as an appeal to jurors' potential prejudice." Bagby, 200 Wn.2d at 793.[11]

For the reasons above, we hold all four Bagby factors weigh against Bellerouche's claim and he has failed to establish that an objective observer could view the State's conduct as an appeal to racial prejudice. Id. at 793-94.[12]

C.      State's Argument That Bellerouche Would "Come Back and Finish the Job"

The State asserted in its closing argument that Robinson refused to return to his apartment after the shooting because Bellerouche "might well come back and finish the job." Bellerouche argues the State's committed prosecutorial

---

[11] Following oral argument, the State filed a motion to supplement the record. As we need not rely on the evidence the State wishes to add to the record, we deny this motion as moot.

[12] Bellerouche also more generally argues that "at every turn, harmful racial stereotypes about young Black men cropped up" even though the "defense successfully obtained the exclusion of some of that evocative evidence." Specifically, he complains about (a) a cellphone video, which the State argued showed Bellerouche with a gun; (b) song lyrics which could be heard in the same cellphone video, though slurs were redacted; and (c) the fact that the State unsuccessfully attempted to admit approximately 200 photos from Bellerouche's Arizona home, the vast majority of which the trial court excluded. It is true that we are instructed to gauge the State's conduct "in the context of the entire record and the circumstances at trial." State v. Azevedo, 31 Wn. App. 2d 70, 78, 547 P.3d 287 (2024). But, as to (c), we "generally do not apply the concept [of prosecutorial misconduct] to the introduction of evidence." State v. Kelly, 32 Wn. App. 2d 241, 260, 555 P.3d 918 (2024). And, still as to (c), Bellerouche does not connect the challenged evidence to the State's usage of "beef." For none of this does Bellerouche explain specifically how the State's actions above were not in good faith. Id. We are left with nothing more than high level accusations of "pervasive" racial bias, tied to very little in the record. Otherwise, the dissent's assertion that, in considering these facts (and others Bellerouche does not), "the objective observer could conclude that the 'beef' remarks were among the breadcrumbs dropped by the prosecutor to lead jurors down a path . . . to jurors' racial bias" is another example of straying into "theoretical conceivability," rather than "reasonable possibility." Dissent at 43-48.

misconduct when its closing argument improperly "urge[d] the jury to decide the case based on evidence outside the record" and "appeal[ed] to jurors' fear of 'what would have happened.'" United States v. Nobari, 574 F.3d 1065, 1077 (9th Cir. 2009). In other words, he avers the State's closing argument "was not a reasonable inference from Mr. Robinson's testimony" and "invited jurors to speculate about what might happen if they did not convict Mr. Bellerouche." We disagree.

1. Additional Facts

The State argued in full:

> [Robinson] realized that [Egger] wasn't his friend, that [Egger] was better friends with [Bellerouche]. Which meant, of course, that [Bellerouche] could figure out in a minute where . . . Robinson lived because . . . Egger had been living there too. And . . . Robinson knew that if [Bellerouche] did this at 2:35 a.m. on July 26, 2020, *he might well come back and finish the job*.

(Emphasis added.) Bellerouche's trial counsel objected, stating "[f]acts not in evidence" and "[e]motional appeal." The court overruled the objection.

Earlier at trial, the State asked Robinson if Egger "was sta[ying][13] with you at the time of this shooting in your apartment?" Robinson answered affirmatively. The State then asked "[d]id you ever go back to that apartment after the shooting?" Robinson answered "I did not." When the State asked Robinson why he never returned to the apartment, he explained he "wasn't taking no chances" and "[j]ust the fact that [Egger] knew that I got shot, just (inaudible) that apartment." Additionally, Bellerouche agreed with the State's characterizations that he had

---

[13] The trial transcript used the word "standing." However, "standing" is likely a typo given the context of the State's questions.

been "friends" with Egger "for years."

## 2. Discussion

For a claim of non-race-based prosecutorial misconduct, "the defendant bears the burden of proving the prosecutor's conduct was both improper and prejudicial." State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).

We assess the propriety of a prosecutor's conduct "in the context of the entire record and the circumstances at trial." State v. Azevedo, 31 Wn. App. 2d 70, 78, 547 P.3d 287 (2024). We have long held that prosecutors have "wide latitude in closing argument to draw reasonable inferences from the evidence." State v. Boehning, 127 Wn. App. 511, 519, 111 P.3d 899 (2005). That said, "a prosecutor may not make statements that are unsupported by the evidence and prejudice the defendant." Id. Further, "[r]eferences to evidence outside of the record and bald appeals to passion and prejudice constitute misconduct." State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009).

If "'the defendant objected at trial," as Bellerouche did here, "the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.'" Azevedo, 31 Wn. App. 2d at 78.

"Evidentiary rulings are reviewed for abuse of discretion and reversed only if the 'exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons.'" State v. Lormor, 172 Wn.2d 85, 94, 257 P.3d 624 (2011) (quoting In re Det. of Post, 170 Wn.2d 302, 309, 241 P.3d 1234 (2010)).

Tying these principles together, our Supreme Court reversed a conviction

because the State invoked the defendant's "associations with [the American Indian movement] rather than properly admitted evidence." State v. Belgarde, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988). As a further example, this court disapproved of the State's "argument as to [the defendant's] thought process before the crimes." State v. Pierce, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012). While the State "could have properly argued that the jury should infer from the evidence" what the defendant's motivations were, the State "went beyond" and "effectively testif[ied] about what particular thoughts [the defendant] must have had in his head." Id. at 554-55.

In the present appeal, the State's closing argument was based on a reasonable inference from trial testimony. Robinson testified that he did not return to his apartment as he was "taking no chances." Robinson further explained that Egger, his then roommate and a friend of Bellerouche, "knew that I got shot." The State reasonably inferred from this testimony that Robinson was "taking no chances" because he feared Bellerouche could find him through his friend, Egger.

In response, Bellerouche cites to Russell, 125 Wn.2d at 89, for the proposition that "prosecutors are not permitted to play to the jury's fear with hypothetical scenarios." There, our Supreme Court disapproved of the prosecutor's comment that the defendant would "find new friends" as there "'is no shortage of naieve [*sic*], trusting, foolish young people in the cities of this country.'" 125 Wn.2d at 89.

In the present appeal, the State's closing argument was closely tied to Robinson and Bellerouche's own testimony. It was not based on mere

"hypothetical scenarios" as Bellerouche argues under Russell, but on a reasonable inference from Robinson's desire not to return home. As our Supreme Court explained in State v. Dhaliwal, the "spontaneous statements" untethered to the record in cases like Belgarde lie in stark contrast to "inferences from prior testimony." 150 Wn.2d 559, 579, 79 P.3d 432 (2003).

As such, we hold the State's argument was neither based on evidence outside the record or a "bald appeal" to the jury's prejudice or passions. Fisher, 165 Wn.2d at 747. In other words, the court did not abuse its discretion in overruling Bellerouche's objection. Lormor, 172 Wn.2d at 94.[14]

D.      Victim Penalty Assessment and Clerical Error

At Bellerouche's January 2023 sentencing, the court imposed a Victim Penalty Assessment (VPA). Subsequently, the legislature amended RCW 7.68.035 to add subsection (4) which states the "court shall not impose the penalty assessment under this section if the court finds that the defendant, at the time of sentencing, is indigent." LAWS OF 2023, ch. 449, § 1. The legislature also added that "[u]pon motion by a defendant, the court shall waive any victim penalty assessment imposed prior to [the effective date] if . . . [t]he person does not have the ability to pay the penalty assessment . . . if the person is indigent." Id. Later, this court held that because "this amendment did not take effect until after [the defendant's ]sentencing, it applies to [the defendant] because this case is on direct

---

[14] Bellerouche also briefly alludes to the cumulative error doctrine, which "applies when several errors occurred during trial that would not merit reversal standing alone, but together effectively denied the defendant a fair trial." In re Det. of McGray, 175 Wn. App. 328, 343, 306 P.3d 1005 (2013). This doctrine is inapplicable where, as here, we have found no error.

appeal." State v. Ellis, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023).

Here, Bellerouche argues and the State concedes that this court should remand to strike the VPA. As Bellerouche's case is on direct appeal, we accept the State's concession and remand with instructions for the superior court to strike the VPA.

Bellerouche's judgment and sentence also states he was convicted of assault in the first degree under both subsections (a) and (d) of RCW 9A.36.011(1). RCW 9A.36.011(1)(a) requires the accused act "with intent to inflict great bodily harm" and "[a]ssault[] another with a firearm." RCW 9A.36.011(1)(d) requires the accused act with the same intent, but to "assault[] another and inflict[] great bodily harm." At trial, the court instructed the jury only on RCW 9A.36.011(1)(a). Further, the jury returned a verdict only on RCW 9A.36.011(1)(a).

Here, Bellerouche argues and the State concedes that the judgment and sentence lists RCW 9A.36.011(1)(d) in error. We accept the State's concession and remand with instructions for the superior court to correct the error and strike all references to RCW 9A.36.011(1)(d) from Bellerouche's judgment and sentence.

### III.     CONCLUSION

We remand the matter with instructions for the superior court to strike the VPA and references to RCW 9A.36.011(1)(d) in Bellerouche's judgment and sentence. Otherwise, we affirm.

Díaz, J.

I CONCUR:

State v. Bellerouche No. 84887-9-I

COBURN, J. (concurring in part and dissenting in part) — This appeal stems from a trial in which Bernard Bellerouche, a Black man, was convicted of shooting Terrance[1] Robinson, another Black man.[2] There is no question that Robinson was shot. The issue for the jury was by whom. With no direct evidence to identify Bellerouche as the shooter other than Robinson's testimony, and no evidence of a motive, the trial hinged on the jury's assessment of Bellerouche's credibility as compared to that of the victim.

With regard to Bellerouche's race-based prosecutorial misconduct claim, the majority correctly identifies that the proper test in determining whether a prosecutor "flagrantly or apparently intentionally appealed to jurors' potential racial bias" requires an appellate court to "ask whether an objective observer could view the prosecutor's questions and comments as an appeal to jurors' potential prejudice, bias, or stereotypes in a manner that undermined the defendant's credibility or the presumption of innocence." State v. Bagby, 200 Wn.2d 777, 793, 522 P.3d 982 (2023) (plurality opinion) (footnote omitted);[3] see majority at 18. And although the majority mentions, correctly, that this analysis must be considered in "the context of the trial as a whole,"

---

[1] The record varies in the spelling of Robinson's first name. This dissent uses the spelling that is used by the parties in their briefing to this court.

[2] This dissent uses the term "Black" instead of "African American" because it is the term used by Bellerouche in his briefs. It is undisputed that Robinson also identifies as Black.

[3] As stated in a per curiam summary that preceded the lead opinion, the state Supreme Court in Bagby, 200 Wn.2d at 779, unanimously held that "the prosecutor's conduct objectively constituted a flagrant or apparently ill-intentioned appeal to jurors' racial bias in a way that undermined the defendant's credibility and presumption of innocence." The two bases of race-based misconduct were the prosecutor's repeated use of the term "nationality" to differentiate Bagby from other witnesses and the prosecutor's description of several White witnesses as "Good Samaritans" while conspicuously not doing the same for the only Black witness. Id. However, as further discussed below, five justices in a concurring opinion written by Justice Stephens disagreed with the four-justice lead opinion that the prosecutor committed race-based misconduct by questioning a witness about Bagby's dog. See id. at 779-80 (lead opinion of Montoya-Lewis, J.); id. at 804-08 (Stephens, J., concurring).

State v. Roberts, 32 Wn. App. 2d 571, 607, 553 P.3d 1122 (2024), they fail to do so, either relegating much of the relevant context to a footnote or ignoring it altogether. See majority at 18, 22 n.9. Despite recognizing that the Washington Supreme Court has held that "a race-neutral alternative explanation does not excuse the effect of language that appeals to racial bias," Henderson v. Thompson, 200 Wn.2d 417, 439, 518 P.3d 1011 (2022) (citing State v. Berhe, 193 Wn.2d 647, 666, 444 P.3d 1172 (2019)), the majority shrugs off the prosecutor's "beef" remarks as isolated uses of a term that is "simply slang for a 'grievance or ground for complaint' without any racialized sense of the word." Majority at 21 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 196 (2002)), 25. The majority recognizes but fails to apply the lens by which we are to look at a prosecutor's rhetoric, which is not constrained to any dictionary's chosen lexicon but through the perspective of an objective observer who is aware of the history of race and ethnic discrimination in our country and that implicit, institutional, and unconscious biases, in addition to intentional discrimination, have influenced jury verdicts in our state. Bagby, 200 Wn.2d at 793 n.7.

In consideration of a trial that turned on a credibility contest and based on a close review of the record, I believe Bellerouche met his burden in establishing race-based prosecutorial misconduct. An objective observer could conclude that by repeatedly and unnecessarily using the term "beef" in the context of this trial, it was apparent that the prosecutor intentionally appealed to jurors' potential racial bias to speculate a potential motive that was not otherwise supported by the evidence. Additionally, I believe that the trial court abused its discretion by admitting photos of Bellerouche wearing a T-shirt with a sexually suggestive pun and image that could be viewed as objectifying women, and

that such error was not harmless. Either error violates Bellerouche's constitutional right to a fair trial before an impartial jury. Thus, I respectfully dissent. I concur with the majority's resolution of the remaining issues.

FACTS

Because "[a]n allegation of race-based prosecutorial misconduct requires a close and thorough examination of the record," State v. Zamora, 199 Wn.2d 698, 704, 512 P.3d 512 (2022), I start by providing a summation of the facts. Though admittedly lengthy, it is these facts that provide the determinative context that supports remand for a new trial. I then examine Bellerouche's race-based prosecutorial misconduct and evidentiary contentions in turn.

*A. The Memorial*

In the afternoon on July 25, 2020, Bellerouche drove himself to a memorial for his childhood best friend Lloyd Whitney. Whitney had died the previous year in north Seattle near 102nd Street and Aurora Avenue. The memorial was held on Whitney's birthday outside his sister's house in Auburn.[4] See Ex. 65. Many children and adults attended the memorial, including Solomon Egger.[5] See Ex. 65. Bellerouche and Egger were friends and also grew up with each other. At this time, Egger was staying with Terrance Robinson. Robinson testified he dropped Egger off at a gathering in Auburn but did not attend himself.

The State introduced a text message exchange between Bellerouche and Egger that occurred around 1 a.m. the morning of the memorial. See Ex. 86. Bellerouche

---

[4] Though the testimony described the location as outside a "house," the event that is captured on video appears to take place in the parking lot of an apartment complex. See Ex. 65.

[5] As the majority notes, the record also uses "Eggers." This dissent uses "Egger" based on the parties' briefing.

wrote, "I'm sad bro." Ex. 86. Egger responded in part, "I miss him so much Bro I need you Bro." Ex. 86. Bellerouche texted, "I can't do it bro. I can't. Gotta get my mind right. I'll link with you in the morning bro." Ex. 86. Egger responded, "I understand I'm here if you need me." Ex. 86. When asked what Bellerouche was talking about, Bellerouche testified he was referring to going to Whitney's memorial. Bellerouche testified he ultimately attended the memorial because "my kids' mother convinced me to go, saying that Lloyd [Whitney] would actually want me there."

At the memorial, individuals, including someone in a blue shirt later identified at trial by Bellerouche as his friend Demetrius Lindsey, distributed balloons for people to write messages on before releasing them. Ex. 65, at 08 sec. to 23 sec.; 01 min., 59 sec.; 02 min., 01 sec. to 02 min., 25 sec.; 08 min., 21 sec. to 08 min., 43 sec.[6] Bellerouche took photos of the released balloons with his cell phone. See Ex. 11.1-.4.[7] One of the photos from Bellerouche's cell phone captured part of Lindsey's blue shirt at the memorial. See Ex. 11.1. Some of the memorial was recorded in a video on Egger's cell phone. See Ex. 65. Throughout the day of the memorial, Bellerouche texted his friend Dino Nguyen. Bellerouche expressed sadness and encouraged Nguyen to come to the memorial. Bellerouche testified that someone brought a bottle of Remy Martin cognac to the memorial that he and "various" people drank from. Bellerouche drank from the bottle throughout the night but testified he was not intoxicated.

Later in the evening, the memorial gathering moved to the location in north Seattle where Whitney died. Bellerouche drove himself and his first son's mother,

---

[6] All times referenced to exhibit 65 represent minutes and seconds in relation to playing time of the video and not the time of day.

[7] Citation to exhibit 11 incorporates how the slides of the photos are identified by number. The same applies for exhibits 54 and 68.

Leandra Stanton, to the north Seattle location. Fifty or more people, including Robinson, gathered to place candles and flowers and release more balloons.

## B. The Business Plaza Shooting

Around midnight about 30 people left the north Seattle site and gathered outside of a Chinese restaurant in a business plaza in Shoreline near 152nd Street and Aurora Avenue. According to Bellerouche, Egger drove himself and Bellerouche in Bellerouche's BMW to the business plaza, along with Bellerouche's children and Stanton. Nguyen also arrived in his Audi. Robinson drove his rental car and arrived before the BMW or Audi. After he arrived at the plaza, Robinson first met up with a "lady friend" named Naj. They got some Chinese food together, but by 2:30 a.m., she was gone. At trial Robinson testified that Bellerouche drove the BMW to the business plaza.[8] Robinson did not particularly take note as to how Egger arrived, but indicated that Egger could have arrived in either Bellerouche's BMW or Nguyen's Audi. People, including Bellerouche and Robinson, got food at the business plaza and drank cognac in the parking lot.

A security video from a McDonald's restaurant neighboring the business plaza shows part of the business plaza's parking lot where the shooting occurred. The video never shows Bellerouche, Nguyen, or the shooting. The video starts at two in the morning with Nguyen's Audi and Bellerouche's BMW already parked in the parking lot.

---

[8] In response to the prosecutor's question, "Do you know who was driving which truck when they arrived?" Robinson responded, "You know, driving his truck and [Nguyen] driving his truck." It is apparent from the preceding exchange that "trucks" refers to Nguyen's white Audi and Bellerouche's black BMW. Robinson identified Nguyen as the owner of the Audi and Bellerouche as the owner of the BMW.

5

See Ex. 17, at 2:00:00 a.m.[9] Robinson's rental car also is already parked, located on the far side of the parking lot from the Audi and BMW. See Ex. 17, at 2:00:00 a.m. Police only requested and obtained one hour of security video from McDonald's for the time period of 2 a.m. to 3 a.m.

At the start of the video, other than the Audi, BMW, and Robinson's rental car, a few other vehicles are parked in the part of the parking lot captured by the security camera. Ex. 17, at 2:00:00 a.m. Nobody can be seen inside any of the vehicles and nobody can be seen outside in the parking lot. Ex. 17, at 2:00:00 a.m. For the entire video, the driver's side of Nguyen's white Audi is closest to the security camera. Ex. 17. To the right of the Audi, about one parking space over, is Bellerouche's black BMW. See Ex. 17. Throughout the video, only the bottom half of the driver's side of the BMW can be seen. Ex. 17. The backs of the Audi and BMW face the camera and are angled in a way that makes it impossible to see the passenger side of either vehicle at any point in the video. Ex. 17. An empty bottle, later identified as the Remy Martin cognac bottle, sits on the pavement near the curb between the two vehicles. See Ex. 17. At trial Bellerouche conceded his fingerprints were on the Remy Martin cognac bottle.

The first half an hour of the video, see Ex. 17, captures a few vehicles that come in and out of the scene. Robinson testified that the person driving an SUV that is shown temporarily stopped in front of the Audi "was like a brother" to him but Robinson did not want to give his name. See Ex. 17, at 2:02:34 a.m. to 2:04:54 a.m. A few minutes later, Robinson is seen walking out from behind the passenger side of the Audi to his rental car and later returning to the Audi and getting into the back seat on its driver's side. See

---

[9] Time references related to events captured in the McDonald's video, exhibit 17, reflect the time of day indicated on the video recording.

6

Ex. 17, at 2:06:09 a.m. to 2:06:40 a.m.; 2:09:48 a.m. to 2:09:51 a.m.; 2:10:26 a.m.

Robinson testified he had a gun with him the night of the shooting but gave conflicting testimony at trial regarding the gun. He testified both that he left it in his rental car before later getting into Nguyen's Audi, and also answered, "No. Not sure" when asked if he retrieved the gun when he is shown in the video getting into his rental car before later getting into Nguyen's Audi.

The video also captures someone walking back and forth between the BMW and the Audi before walking out of view. Ex. 17, at 2:09:48 a.m. to 2:09:51 a.m.; 2:11:08 a.m. to 2:11:41 a.m. At trial Robinson testified this person was "a baby mother." The prosecutor asked Robinson "whose" baby mother it was. Robinson's answer was inaudible for the transcriptionist.

The video also captures Egger exiting the driver's seat of the BMW and stand and walk alongside the BMW. See Ex. 17, at 2:13:52 a.m. to 2:16:44 a.m. He is seen approaching a sedan that eventually parks in reverse in a parking spot that appears to be directly across from and facing the Audi. See Ex. 17, at 2:16:44 a.m. to 2:17:43 a.m. When asked who was in that car, Robinson claimed that he did not know while also giving information about the driver. He said the sedan was occupied by a single driver who was "an innocent bystander" from out of town who "didn't know what's going on" and was "not even here anymore." Robinson claimed to not know the person's "government" name and did not otherwise provide any name..

A couple minutes later in the video, Egger walks back and forth between the Audi and BMW. See Ex. 17, at 2:19:31 a.m. to 2:19:42 a.m. He eventually gets into the driver's seat of the BMW where he sits with the door open after Robinson opens the

Audi's driver's side rear passenger door from the inside and leaves it slightly ajar. See Ex. 17, at 2:27:55 a.m. to 2:33:57 a.m. (Egger sits with door open); 2:20:51 a.m. to 2:20:56 a.m. (Robinson opens door). About a minute before Egger gets into the driver's seat of the BMW, another vehicle is seen coming into view from the right of the BMW, driving in front of it and the Audi and then out of view. Ex. 17, at 2:26:14 a.m. to 2:26:22 a.m. Bellerouche testified that Stanton and her friend were inside this vehicle.

Several minutes later, the rear passenger door on the driver's side of the Audi opens further and remains almost fully open. Ex. 17, at 2:33:25 a.m. Robinson first dangles his left foot outside the door. See Ex. 17, at 2:33:40 a.m. to 2:33:47 a.m. He then kicks the door more open, jumps out of the Audi, and slams the door closed behind him as he runs to the left out of frame. Ex. 17, at 2:33:49 a.m. to 2:33:51 a.m. Robinson testified to being shot in the face while he was in the Audi and that he believed he was shot again while he ran away. On direct the prosecutor asked Robinson, "Where'd the shot come from?" Robinson answered, "In that truck, in the car." The prosecutor asked, "Which seat?" Robinson answered, "Defendant." Within seconds of Robinson running away, the Audi, the BMW, and the unidentified sedan that was parked directly across from the Audi drive out of the frame. See Ex. 17, at 2:33:59 a.m. to 2:34:13 a.m.

Robinson ran across Aurora Avenue to a casino, where employees called 911. Robinson informed an emergency responder that he did not get a good look at who shot him. According to a responding deputy, Robinson was able to communicate that someone in a "bluish" car pulled up to him and shot him while he was walking. Robinson testified at trial that he did not remember what he told the deputy, but when shown an exhibit of the incident report, said, "If I said that, then I guess that's what I told him."

*C. The Investigation*

While at the hospital after the shooting, Robinson refused to meet with detectives. Robinson's stepfather, Karlton Daniel, testified Robinson told him in the hospital that "Crucial" was the person who shot him. The parties stipulated during trial that Bellerouche's nickname is "Crucial."

Investigating detective John Free connected the name "Crucial" with Bernard Bellerouche and prepared a photomontage with his photo. When detectives Free and Chris Johnson visited Robinson on July 29, Robinson was uncomfortable speaking with them and refused to look at the photomontage or be recorded. Both detectives testified that Robinson told them something to the effect of "I can do one better" or "I'll do you one better," and showed the detectives a photo through his cell phone. Detective Free testified that the phone displayed the same photo of Bellerouche that was in the photomontage and that after Robinson showed the photo on his cell phone, Robinson said, "That's him right there." Robinson testified at trial that he did not believe he showed the detectives any photo, the same answer he gave the prosecutor previously during a defense interview.[10]

After initially closing the investigation as a result of Robinson's lack of cooperation, detective Free visited Robinson again on August 13. Robinson again

---

[10] On direct Robinson was asked, "While you were with [detectives Free and Johnson], did you show them a picture of your phone, on your phone, of the person who shot you?" Robinson's answer was inaudible for the transcriptionist. The prosecutor later asked, "Did you at that first meeting show the phone and tell Detective Free you'll do him one better rather than the photo lineup?" Robinson answered, "I don't remember the words. I remember (inaudible)." The prosecutor then asked Robinson, "Did you tell Detective Free at that first meeting who shot you?" Robinson answered, "I believe so, yes." Defense inquired with Robinson on cross, "You testified on direct that you don't believe you showed the detectives any photo." Robinson confirmed, "Right." Defense asked, "And you never showed them a picture from your phone?" Robinson answered, "If I did, I have no memories of it."

appeared nervous, refused to be recorded, and identified "Crucial" as the person who shot him. Robinson identified both Egger and Nguyen through photomontages. After looking at a photomontage that included Bellerouche, Robinson wrote "No pic" on the photomontage. See Ex. 81. At trial detective Free testified that Robinson, as he was looking at the photomontage, said, "You saw the picture I showed you before." During this same meeting, Free testified that Robinson identified the shooter by the name "Crucial." At trial Robinson testified he did not identify "Crucial" in the photomontage.

Bellerouche moved to Arizona in September to join three of his children and their mother, Amanda Marks. The State charged Bellerouche in October with assault in the first degree and unlawful possession of a firearm in the first degree. A detective flew to Arizona and arrested Bellerouche in December 2020. Police took photos of Bellerouche at the time of his arrest and of his BMW parked in the driveway. See Ex. 68.1; Ex. 54.2-.4. These photos, as well as dozens of photos taken inside Bellerouche's home, were admitted and shown at trial.

*D. Trial*

Bellerouche's 10-day trial was held the fall of 2022.[11] At the start of the State's opening statement, the prosecutor introduced the State's theory of the case, stating:

> On July 26th, 2020 around 2:35 a.m., Terrance Robinson was shot in the face while he was sitting in the back of a parked car. A guy that [Robinson] knew as Dino [Nguyen] was in the driver's seat. And a guy that [Robinson] knew by the nickname Crucial was sitting in the front passenger seat, to [Robinson's] right.
> Terrance Robinson was unarmed. Terrance Robinson was unsuspecting. There had been no argument. There was no beef.
> Suddenly and without provocation, Crucial, whose real name is

---

[11] Because the trial was bifurcated, the jury only heard evidence related to the charge of assault in the first degree and determined a verdict before hearing unrelated evidence of Bellerouche's previous conviction that supported the second charge of unlawful possession of a firearm (UPF) in the first degree. The UPF charge was based on the shooting of Robinson.

> Bernard Bellerouche, … turned on [Robinson], pulled a gun, and shot him point blank.…
>> As [Robinson] fled for his life, Bernard Bellerouche shot [Robinson] twice more, once in the shoulder as [Robinson] scrambled out of the car, once in his back, in Terrance Robinson's back, as he flailed and fled.

Defense told the jury at opening that the day before the early morning shooting, on July 25, 2020, Bellerouche was honoring the life and birthday of his best friend, T.C., who "had passed away the year before. You'll see text messages about how heavy [Bellerouche] felt mourning the loss of his friend." Defense told the jury that in the memorial video they would see a bottle of cognac "being passed around, T.C.'s favorite alcohol." Defense conceded at opening that Bellerouche was in the business plaza parking lot when Robinson was shot. Defense asserted, however, that Bellerouche "never was in Dino Nguyen's [Audi] … and he was not the shooter" and that there was "nothing corroborating Terrance Robinson's story that he was."

The State's only witness who was present at the time of the shooting was Robinson. By the time of trial, Robinson was willing to identify Bellerouche in the same photomontage he was shown by the detectives on August 13, 2020. When asked why he did not previously identify "Crucial" in the photomontage presented by detectives, Robinson said, "Unsure. I don't know … [d]on't want to go that route." When asked why he did not previously identify "Bernard Bellerouche" in the photomontage, Robinson responded, "Not ready I guess."

Detectives were unable to locate Nguyen. Egger was "discovered dead in Seattle" before investigators could speak with him. Police obtained Egger's cell phone. The prosecutor referenced Egger's death during the State's opening statement:

> On September 5, 2020, about five weeks after the shooting in this case, as investigators were seeking to talk with Solomon Egger about his

role in this case as a witness in this case, Solomon Egger was found dead in Seattle. There was an investigation into Egger's death. Some evidence from that investigation was included in this case. A cellphone video was pulled from Solomon Egger's phone.

You'll see that video during this trial. It was taken a few hours before our shooting. … The video is from the evening of July 25th. It was at what appears to be a birthday party. You'll see the cognac bottle that I mentioned earlier that Karlton Daniel found. You'll see that in the video. You'll see somebody who looks an awful lot like Bernard Bellerouche carrying an object that looks an awful lot like a firearm.

The video of the memorial is captured from the perspective of outside the right side of Bellerouche's BMW[12] that is partially in view. See Ex. 65.

On direct the State questioned detective Joshua Rurey about the contents of the memorial video taken with Egger's cell phone, which was also played for the jury during his testimony. The video begins by showing a Black man in a blue shirt among a group of adults and children and a large collection of balloons that are being distributed. Ex. 65, at 0 min. to 0 min., 05 sec. The man holds balloons in both hands and walks toward the BMW. Ex. 65, at 0 min. to 0 min., 20 sec. Something slender, silvery, and shiny appears to be dangling from his left hand as he holds the balloon strings. The video captures a close-up view of the man's face that shows a nose piercing on the left side of his nose and earrings in both ears.[13] Ex. 65, at 0 min., 52 sec. to 0 min., 54 sec. He also appears to be wearing prescription glasses. The video also captures someone sitting in the BMW wearing a black shirt with a design on it and what appears to be the person holding the phone that is taking the video. Ex. 65, at 0 min., 56 sec. to 1 min., 01 sec.

---

[12] The video itself does not indicate that the black vehicle is Bellerouche's BMW, but Bellerouche testified at trial that it is his black BMW in the video.

[13] The earring in the man's right ear can be seen the second time that his right ear appears on screen. See Ex. 65, at 0 min., 52 sec. to 0 min., 54 sec. In real time it can be difficult to see the earring in the man's right ear, but it is clearly visible when the video is played at an extra slow speed.

Bellerouche testified that he was the person wearing the black shirt and was sitting in the driver's seat of the BMW, and that the person taking the video was Egger. About a minute later the video shows what appears to be the same Black man in the blue shirt who was previously holding balloons walking with his back to the camera around the front of the BMW with something sticking out of his right hand that is slender, silvery, and shiny. Ex. 65, at 1 min., 58 sec. to 1 min., 59 sec.

Rurey testified that the man's "face appeared similar to Mr. Bellerouche" and that he was holding what "appeared" to be a firearm. Detective Free also testified that he believed the man in the blue shirt to be Bellerouche holding a gun. Free conceded that he reviewed the video with another detective who had the capability of enhancing the video to either rule in or rule out whether the object was a firearm, but the detectives decided not to get the video enhanced:

Q:      You have the ability to – you have someone in your office, Detective Mellis?
A:      Yes.
Q:      And he does video enhancement?
A:      He does, yeah.
Q:      And you both looked at this particular video?
A:      Yes.
Q:      But you decided not to get this enhanced?
A:      Decided not to get it enhanced. I think – so he did look at, he did look at this video, and I think we – ultimately, it was my opinion, and it was his opinion that it could either be ruled out or ruled in as a firearm.
Q:      Alright. But you have said that you believed it to be a firearm?
A:      Yes. In fact, the dark handle, the shape, the length, one particular firearm that comes to mind for me is an Airweight .38, but I don't say for certain.

Bellerouche offered expert testimony of enhanced still images of the memorial video that showed the item in the man's hand. See Ex. 78. The expert testified that the item was made up of two different parts with different hue and brightness levels, and that the

13

lower piece reflects more light than the upper piece and was about half the size of the holder's "next finger."

On cross, when shown still photos from the enhanced video that captured a close-up of the Black man's face, detective Rurey confirmed the image of the man's face appeared to show he had an earring and nose jewelry. See Ex. 71. Bellerouche testified he did not have nose jewelry or earrings, and the man in the memorial video was his friend Demetrius Lindsey who was holding car keys with a bottle opener attached. Photos that Bellerouche took with his own phone obtained by police also included a photo that captured in the foreground a part of the Black man in the blue shirt identified by Bellerouche as Lindsey. See Ex. 11.1.[14] Lindsey was clean shaven in the memorial video. See Ex. 65, at 0 min., 53 sec. to 0 min., 54 sec. An identification card of Bellerouche obtained during a search of his home in Arizona and admitted at trial depicts him with a slight moustache and filled-out beard and without glasses or a nose piercing.[15] See Ex. 54.8. The arrest photos that were admitted at trial also depict Bellerouche with a slight moustache and filled-out beard and without glasses, a nose piercing, or earrings. See Ex. 68.1. Bellerouche's testimony that the Black man wearing the blue shirt was Lindsey was unrebutted. Robinson was never asked to identify whether the Black man in the blue shirt was Bellerouche, whether the Black man wearing the blue shirt was carrying an object that resembled the gun that was used to shoot Robinson, or whether Bellerouche wore a blue shirt at the time of the shooting.

_____

[14] Bellerouche's testimony that identified the man in the memorial photos taken with his phone referred to exhibit 12. Both exhibits 11 and 12 were admitted at trial, but exhibit 12 was not designated in the clerk's papers. The record shows that exhibit 11 was introduced as a CD of photos from Bellerouche's phone and exhibit 12 consisted of printed photos from that same CD.

[15] The identification photo does not show the lobes of Bellerouche's ears. See Ex. 54.8.

14

In the memorial video obtained from Egger's cell phone, the playing of artist Lil Wayne's entire rap song *I Miss My Dawgs*[16] is captured, and runs for approximately 4 minutes and 18 seconds. See Ex. 65, at 1 min., 12 sec. to 5 min., 30 sec. Before trial, defense objected to the audio, arguing that "the cultural expressions [in the video] could be misperceived as 'gangsta rap' or some sort of endorsement of gang-mentality or attitudes" and place Bellerouche in an unfairly negative light based on his race.

The State agreed to redact any use of "the N word" but argued the remaining song audio should remain in the video because the song overlaps with audio relevant to the State's theory, including someone asking, "Are you off to Aurora?" and the sound of liquid being poured out of what the State believed was the Remy Martin cognac bottle. The State explained that its theory of the case was based on "the idea" that Bellerouche attended a birthday party for his friend, Whitney, "who had recently been murdered," that Bellerouche had that friend's initials tattooed on his hand, that Bellerouche talks about his friend as his "'right-hand man,'" and that Bellerouche was missing the friend.[17] The State explained the audio is part of its "pouring one out" theory and the audio of "'You off to Aurora' is obviously squarely relevant to proving that Mr. Bellerouche was later at Aurora."

This discussion followed the State's concession at an earlier pretrial discovery hearing when the court asked the State if it had identified a motive in the instant case and whether there was "a relationship between these people that the state is alleging would have led to an act of violence?" The prosecutor conceded that because there was

---

[16] Defense identified the artist and song title to the trial court.

[17] Later at trial the State introduced a photo of Bellerouche's tattooed hand, which I reference below. See Ex. 68.2.

15

no indication that Robinson or Egger had any connection with the "murder" of Whitney, the State's theory was "not retaliatory." Instead, the prosecutor stated that "there is speculation about the motive, I think that will be one of the difficult issues at trial" and that "[t]here is the speculation from witnesses … that it was done sort of to commemorate a prior murder" "as a reflection of the gravity of that prior murder others must pay." The prosecutor said that "it's not retaliatory, [but] it's commemoration," "sort of a poor [sic] one out kind of respect situation."[18] At a different pretrial hearing, the court granted the defense motion to limit Robinson's stepfather's testimony by barring any references to drug dealing, gang activity, other acts of violence, or murders. The court also directed the parties to raise any motions regarding gang activity to the extent either party believed it became relevant to the case so that the issue could be addressed outside the presence of the jury.

After the prosecutor made his initial argument during motions in limine as to why the entire audio of the video was needed, the trial court pointed out that "[t]he conversation about 'off to Aurora'?" occurs before the song starts and that the pouring-out sound of liquid occurs after the song ends. The prosecutor later renewed the request that only specific slurs be redacted from the audio. The prosecutor maintained that during the song there are moments of "some coming and going" and that the vehicle shown in the video is consistent with one the victim identifies as belonging to Bellerouche. The prosecutor continued:

> When we see the person kind of walking across the screen, the individual

---

[18] At trial the jury did not hear any evidence that Whitney was murdered or an explanation of the term "pouring out." At trial the prosecutor asked Bellerouche with regard to the sound of liquid being poured out in the memorial video, "Does pouring out liquor like that, does it have a meaning?" Bellerouche answered, "I'm not too sure." The prosecutor then asked Bellerouche, "You've never like heard of like 'pour one out'?" Bellerouche responded, "No."

[in the blue shirt] we believe is Mr. Bellerouche, at two minutes and 15 seconds, we hear a car door close. If that portion, there was no audio, we wouldn't be able to hear the car door closing. And so that just demonstrates a connection between the vehicle and the person in the video and all of that stuff. Somebody's yelling "missing him" at about three minutes and 39 seconds. And so there's just like a lot of context that I think gets eliminated when we use such a rough instrument by suppressing all of the audio.

Defense argued that playing the music and its tone "may overemphasize gang involvement." Defense asserted the song could be connected to Lil Wayne as the artist "who very publicly boasts and brags of his own gang involvement. So if any of the jurors were to recognize that music and song, I think that's a very mainstream and public connection that the artist himself has made."[19] The trial court denied the motion but ordered certain words be redacted from the song.[20]

At trial the video of the memorial, exhibit 65, was played for the jury and admitted into evidence. Contrary to what the prosecutor argued to the court, the video does not capture the sound of a car door closing at 2 minutes and 15 seconds after the Black man in the blue shirt walks in front of the BMW and out of view. In fact, at 4 minutes and 57 seconds the man can be seen walking in front of and then away from the BMW to the right. Well after the song has finished, at 8 minutes and 43 seconds, the Black man in the blue shirt can be seen again walking in front of the car to the left. As the trial court observed, the audio of someone asking a question about "to Aurora" occurs before the song begins at 45 seconds and the sound of pouring liquid occurs around 6 minutes and 16 seconds after the song ends. See Ex. 65, at 0 min., 44 sec. to 0 min., 45 sec.

---

[19] In response to defense's argument, the prosecutor cited Wikipedia as stating that "Lil Wayne is one of the world's best-selling music artists of all time" and is "often cited as one of the greatest rappers of all time."

[20] As ordered by the court, the State redacted the "n" word, the word "bitch," and the word "motherfucker." See Ex. 65, at 1 min., 12 sec. to 5 min., 30 sec.

(Aurora); 6 min., 09 sec. to 6 min., 11 sec. (liquid); 6 min., 14 sec. to 6 min., 16 sec. (cognac bottle). Once the song plays, it is so loud that it drowns out most other sounds.

See Ex. 65, at 1 min., 27 sec. to 5 min., 30 sec. The lyrics to *I Miss My Dawgs* also come through loud and clear. See Ex. 65, at 1 min., 27 sec. to 5 min., 30 sec. The lyrics include the following chorus that repeats three times:

> Man, I miss my dawgs, many nights club hoppin'
> Many nights we were blowin' trees, many nights we were hustling
> Man I miss my dawgs, me and you through thick and thin
> Me and you to the very end, for only you I'll sin again
> Man, I miss my dawgs, many nights club hoppin'
> Many nights we were blowin' trees, many nights we were hustling
> Man I miss my dawgs, me and you through thick and thin
> Me and you to the very end, for only you I'll sin again.

Ex. 65, at 2 min., 28 sec. to 2 min., 53 sec.; 3 min., 42 sec. to 4 min., 07 sec.; 4 min., 56 sec. to 5 min., 21 sec. The jury also heard these lyrics in the song:

> You was my [redacted], my nerve, my joy, my hurt
> My main [redacted] man Turk (oh)
> My other, my partner, I was teacher, he was father
> I skilled, he schooled, we chilled, we moved
> We thug, we hung, we ate, we slept
> We lived, we died, I stayed, you left
> Remember how we played to the left?

Ex. 65, at 4 min., 07 sec. to 4 min., 28 sec. During the State's cross-examination of Bellerouche, the prosecutor asked about Bellerouche's relationship with Whitney:

> Q:  …. you were sad [the day of the memorial]?
> A:  Yes.
> Q:  Because Lloyd Whitney was your friend?
> A:  Yes.
> Q:  Your right-hand man?
> A:  My best friend.
> Q:  Your best friend. And your right-hand man was the phrase I was using.
> A:  Yes.
> Q:  And I'm pointing to my own right hand just because that's where your tattoo is located, right?

18

A:    Yes.

Q:    And you texted with somebody – in your text messages, you referred to Lloyd [Whitney] as your right-hand man, right?

A:    Yes.

Q:    And July 25th, 2020 would have been his birthday had he still been alive?

A:    Yes.

Q:    You were feeling emotional that day about him and his situation and your loss, correct?

A:    Can you repeat that?

Q:    Yeah. You were feeling emotional on July 25th of 2020 about him and the situation and your loss?

A:    Yes.

Without objection, the State admitted and published a photo of Bellerouche's tattooed hand during detective Rurey's testimony. See Ex. 68.2. The tattoo is a design made up of the letters "TC." See Ex. 68.2. Later at trial Bellerouche testified he got the initials tattooed on his hand "[a]s a way to remember [Whitney] by," who went by "TC" for the nickname "Tone Capone."

The prosecutor asked Robinson about his relationships with Egger, Nguyen, and Bellerouche. Robinson testified that he was friends with Egger, had known him for more than 10 years, and that Egger was staying with him at his apartment in Kent at the time of the shooting. The prosecutor asked, "Did you have any beef with Solomon Egger?" Robinson answered, "Not at all." The prosecutor inquired again, "Were you guys, were you trying to kick him out [of your Kent apartment] or were you fighting or anything like that around July 26th?" Robinson responded, "Nothing like that." Robinson testified that Egger introduced him to Nguyen, who Robinson saw "[m]aybe once [or twice] a week" but did not know well.

Robinson testified he and Bellerouche had a friendly relationship before the shooting and had known each other since at least 2009 or 2010. Similar to Egger, the

19

prosecutor inquired, "Prior to this, July 26, 2020, did you have any beef or any argument with Crucial?" Robinson answered, "No."

Robinson testified that he, Bellerouche, Egger, and Nguyen were "[h]anging out" together in the parking lot. A toxicology screening of Robinson's blood after the shooting was positive for cocaine and alcohol. The prosecutor asked Robinson about what he, Bellerouche, Nguyen, and Egger were doing in the parking lot. Robinson confirmed they were drinking cognac but he did not know who brought it. When the prosecutor also asked, "Were you doing cocaine?" the following exchange took place:

> A.     We were.
> Q.     Who brought that?
> A.     I mean, they both had it.
> Q.     They both had it. What does that mean?
> A.     [Nguyen] and the defendant both had it. I even purchased some from [Nguyen].
> Q.     Okay. Was that a normal thing to be doing in the parking lot when you're hanging out at that place?
> A.     No.
> Q.     No? So it was a little unusual?
> A.     Not unusual but just wasn't like that particular day.
> Q.     Okay. While you were drinking or eating or doing whatever you were doing in the parking lot, were you, did you get into arguments with any of the people that were there?
> A.     No. They was cordial.
> Q.     I'm sorry?
> A.     Everything was cordial.

On cross Robinson testified he was high on cocaine and alcohol at the time of the shooting but "was still functioning."

When the shooting occurred, Robinson testified he was sitting in the back seat of Nguyen's Audi on the driver's side. Nguyen was in the driver's seat and Bellerouche was in the front passenger seat. Robinson testified that Egger was "next to" Bellerouche's BMW when the shooting occurred but that he had been in the Audi at

some point before the shooting. When asked on direct who shot him, Robinson answered, "The passenger in the white truck."[21] When the prosecutor followed up by asking, "Is that you want to say? You don't want to identify him in any other way?" Robinson said, "The defendant." Later the prosecutor again asked Robinson, "I'm going to ask you this one last time. Did Crucial shoot you?" Robinson answers, "Yes."

Bellerouche testified that he arrived at the business plaza around 12:30 a.m. He and other people talked and got food. He did not see Robinson at the prior gathering in north Seattle, but Egger told him that Robinson was at the business plaza parking lot. Bellerouche knew Robinson through Egger, and that Egger was staying at Robinson's apartment at the time. When asked if he had seen Robinson before July 26, Bellerouche answered, "I knew him, I seen him through [Egger] and like that. But other than that, I didn't have any interactions with him or anything like that. … I didn't know him well."

Bellerouche denied using any drugs the night of the shooting. The State cross-examined Bellerouche about cocaine:

> Q: In the parking lot … let me be clear. I'm talking about … the place of the shooting. In that parking lot that night prior to the shooting, were people doing cocaine?
> A: Not that I'm aware of.
> Q: You heard [Robinson] testify that he bought some cocaine from [Nguyen]?
> A: Yes.
> Q: [Nguyen] was your friend for years. Would it surprise you if [Nguyen] did cocaine that night?
> A: I'm not sure what they were doing that night.
> Q: You're not sure what they were doing that night?
> A: No. I'm not aware of any of that.
> Q: Would you be surprised if [Nguyen] sold cocaine to [Robinson] that

---

[21] It is apparent from the record that Robinson was referring to a passenger in Nguyen's white Audi. As noted above, see supra note 8 and accompanying text, Robinson referred to Nguyen's and Bellerouche's vehicles as "trucks."

night?

A:    I'm not aware of what [Nguyen] does.

Q:    You're not aware of what?

A:    I'm not aware of him doing any drugs.

Q:    That night or ever?

A:    Ever.

Q:    [Robinson] also testified that he bought some cocaine from you.

A:    That's not true.

Q:    Is that true because you know you did not sell cocaine to [Robinson] specifically or because you do not sell cocaine at all?

A:    Can you repeat the question?

Q:    Yeah. You said it's not true, so I'm asking if you are testifying "I know I did not sell cocaine to Terrance Robinson," or are you saying "It's not true. I never sell cocaine"?

Q:    I've never sold cocaine to Terrance Robinson.

A:    To Terrance Robinson. How would you know that if you don't really know who Terrance Robinson is?

A:    I, I'd know if I did something with Terrance Robinson.

Q:    How would you know?

A:    Because I've seen him up here on the stand, and I don't recognize him.

Defense did not object.

Bellerouche testified to sitting in the passenger seat of his BMW at 2:00 a.m. While in the BMW, Bellerouche spent time talking to Stanton and her friend, who were on the passenger side of the BMW. Bellerouche testified that starting before 2:00 a.m., there were people getting in and out of the Audi but he "wasn't really paying attention to who was in that vehicle." When Stanton and her friend left at 2:26 a.m., Bellerouche testified that Egger was already in the BMW and that they "were getting ready to leave." See Ex. 17, at 2:26:18 a.m. to 2:26:20 a.m.

After hearing what sounded like gunshots around 2:30 a.m., Bellerouche testified that he and Egger left in the BMW. Bellerouche testified he and Egger went to Lindsey's house in Pacific Algona. Bellerouche provided cell tower data analysis that showed his cell phone and Egger's cell phone moving south through the same neighborhood,

22

supporting his testimony that they left the parking lot together and drove toward Pacific Algona.

Bellerouche testified Egger told him someone got shot, but Bellerouche did not know who. He testified it was not until his arrest in Arizona that he learned it was Robinson who had been shot. The prosecutor cross-examined Bellerouche about Egger not telling him that Robinson was shot in the face:

> Q: Were you aware that [Robinson] had a gun?
> A: I don't know [Robinson] like that to know that.
> Q: Like that? "I don't know [Robinson] like that." What do you mean "like that"?
> A: I don't, I don't know him. All I know is what [Egger] has said, talked about it, and that's it.
> Q: But [Egger] never talked to you about the fact that Terrance Robinson got shot in the face?
> A: No.
> Q: Were you in fear for your safety with any of those people, [Nguyen], [Egger], or [Robinson]?
> A: No.
> Q: Did you have any arguments with any of them on or about July 25th and July 26th, 2020?
> A: No.
> Q: Any beef with any of them?
> A: No.
> Q: Did you have any arguments with anybody else who was present that night at the parking lot outside the Chinese restaurant?
> A: No.

In the State's closing argument, the prosecutor acknowledged to the jury the lack of an apparent motive for the shooting. The prosecutor stated, "Yes, [Robinson] was correct, there were no arguments, no beefs between anybody at that parking lot that Mr. Bellerouche knew about." The prosecutor continued:

> We talked earlier about the four things that I need to prove in this case. One thing that isn't on that list is why. Why? [Robinson] didn't give us a reason because he didn't have one. Why would Bernard Bellerouche shoot Terrance Robinson in such a cold-blooded way? Point blank. No provocation. [Robinson] had no inkling of any argument....

23

....

So how does this happen? The disdain it takes to commit this crime I think is a clue. Because Bernard Bellerouche's testimony yesterday demonstrated disdain towards Terrance Robinson. … Bellerouche only says "I seen [Robinson]. I didn't know him." … Disdainful.

There was no "I'm sorry about what happened to the friend of my friend, but I didn't do it." … Instead, "He was roommates with my friend Solomon Egger. Yeah, he was friendly, [Robinson] was, with [Nguyen], a guy I was talking to all the time. But no, I didn't know him and I didn't even know he was shot." Full stop.

And in that way, Bernard Bellerouche in his testimony gave us the why in his case, because Terrance Robinson meant nothing to him. … Terrance Robinson did not matter to Bernard Bellerouche.

The prosecutor later ended the State's rebuttal by stating:

The witness in this trial who owned up to these actions, who acknowledged that he might be different from an average Seattle juror was Terrance Robinson. He's not asking for your sympathy. He's not pretending to be a straight-laced boy scout hanging out on Aurora at 2:30 a.m. He told you who he is. He told you he's different. He told you he's familiar with cocaine and guns. And he told you what happened to him. And he told you who did it. Crucial shot him in the face from point blank in cold blood, and then Crucial shot him again as he fled for his life. Don't hold Bernard Bellerouche accountable because he's different. Hold him accountable because he's guilty.

## DISCUSSION

### Race-Based Prosecutorial Misconduct

Bellerouche argues the prosecutor's use of the term "beef" during trial evoked harmful stereotypes of Black men engaged in a world of violent crime, consequently depriving him of a fair trial by "other[ing]" him from the jury. The majority holds that Bellerouche failed to establish that an objective observer could view the prosecutor's repeated use of "beef" as an appeal to racial prejudice. Majority at 29. I disagree.

A criminal defendant has a constitutionally protected right to a "fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961); U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, § 22. The

24

right to a fair trial includes the right to be presumed innocent, "'and its enforcement lies at the foundation of the administration of our criminal law.'" State v. Butler, 198 Wn. App. 484, 493, 394 P.3d 424 (2017) (internal quotation marks omitted) (quoting Estelle v. Williams, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976)). A jury is impartial if it is "'capable and willing to decide the case solely on the evidence before it.'" McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984) (quoting Smith v. Phillips, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982)). Impartiality requires that the jury be unbiased and unprejudiced. Bagby, 200 Wn.2d at 787.

Racial prejudice is "a familiar and recurring evil" that risks systemic harm to the justice system. Peña-Rodriguez v. Colorado, 580 U.S. 206, 224, 137 S. Ct. 855, 197 L. Ed. 2d 107 (2017). A criminal defendant relies on the jury to be a bulwark against racial prejudice and the wrongful exercise of the government's power. Id. at 223. "[C]ourts have been 'called upon to enforce the Constitution's guarantee against state-sponsored racial discrimination in the jury system' and to safeguard 'a criminal defendant's fundamental protection of life and liberty against race or color prejudice.'" Zamora, 199 Wn.2d at 711 (internal quotation marks omitted) (quoting Peña-Rodriguez, 580 U.S. at 222-23). Allowing bias or prejudice by even one juror to contribute to a verdict violates a defendant's constitutional rights. Berhe, 193 Wn.2d at 658. This grave error "undermines the public's faith in the fairness of our judicial system." Id.

The Washington Supreme Court has repeatedly observed a prosecutor's dual role as critical to ensuring our judicial system's integrity. See, e.g., Bagby, 200 Wn.2d at 787; State v. Walker, 182 Wn.2d 463, 476, 341 P.3d 976 (2015). A prosecutor must

both enforce the law and represent the people in a quasi-judicial capacity in the pursuit of justice. State v. Monday, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). Defendants are therefore among the people that a prosecutor represents. Id. Prosecutors owe a duty to defendants to ensure that their constitutional right to a fair trial is respected. Id.

A defendant's state constitutional right to an impartial jury "'is gravely violate[d] … when the prosecutor resorts to racist argument and appeals to racial stereotypes or racial bias to achieve convictions'—such convictions undermine the integrity of our entire criminal justice system." Bagby, 200 Wn.2d at 788 (alterations in original) (quoting Monday, 171 Wn.2d at 676, 680); see Monday, 171 Wn.2d at 676 n.2. Courts must understand that "[w]hen the government resorts to appeals to racial bias to achieve its ends, all of society suffers, including victims." Monday, 171 Wn.2d at 681 n.5.

A defendant's right to an impartial jury is violated "when explicit or implicit racial bias is a factor in [the] jury's verdict." Berhe, 193 Wn.2d at 657 (emphasis added). "Whether explicit or implicit, purposeful or unconscious, racial bias has no place in a system of justice." Henderson, 200 Wn.2d at 421. Accordingly, "[c]ourts must be vigilant of conduct that appears to appeal to racial or ethnic bias even when [it does] not expressly referenc[e] race or ethnicity." Zamora, 199 Wn.2d at 714.

As the majority correctly states, when presented with an allegation of race-based prosecutorial misconduct, an appellate court must determine whether the prosecutor "flagrantly or apparently intentionally appealed to jurors' potential racial bias." Bagby, 200 Wn.2d at 793 (emphasis added). "[W]hen a prosecutor flagrantly or apparently intentionally appeals to a juror's potential racial or ethnic prejudice, bias, or stereotypes, the resulting prejudice is incurable and requires reversal." Zamora, 199 Wn.2d at 721.

In considering a race-based prosecutorial misconduct claim, we must "ask whether an objective observer <u>could</u> view the prosecutor's questions and comments as an appeal to jurors' potential prejudice, bias, or stereotypes in a manner that undermined the defendant's credibility or the presumption of innocence." <u>Bagby</u>, 200 Wn.2d at 793 (emphasis added) (footnote omitted). We do not consider the prosecutor's subjective intent. <u>Id.</u> at 791. "An 'objective observer' is an individual who is aware of the history of race and ethnic discrimination in the United States and that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State." <u>Id.</u> at 793 n.7 (citing <u>Berhe</u>, 193 Wn.2d at 664-65).

To stand as an objective observer, a reviewing court must internalize hard truths about the role of race in the United States. "[R]acism is part of the common cultural heritage of all Americans." A. Leon Higginbotham Jr., <u>Racism in American and South African Courts: Similarities and Differences</u>, 65 N.Y.U. L. REV. 479, 546 (1990). "Mass media depiction of Blacks as thugs, criminals, or people otherwise bent on social disruption has a 400-year history in America" that predates the birth of the United States with "the possession and commodification of Black bodies" underway in the Americas by 1619. Bryan Adamson, <u>"Thugs," "Crooks," and "Rebellious Negroes": Racist and Racialized Media Coverage of Michael Brown and the Ferguson Demonstrations</u>, 32 HARV. J. RACIAL & ETHNIC JUST. 189, 218 (2016). The group of assumptions that have permeated our nation's history "are based on notions, explicit or implicit, of African-Americans as … in poor control of their ids, and otherwise less than fully human." Higginbotham, <u>supra</u>, at 546.

Despite historical strides made with the Civil Rights Movement, "the net result

appears to be that American culture has rejected outright racism while perpetuating a 'hidden prejudice.'" Elizabeth L. Earle, Note, <u>Banishing the Thirteenth Juror: An Approach to the Identification of Prosecutorial Racism</u>, 92 COLUM. L. REV. 1212, 1222-23 (1992) (quoting Charles R. Lawrence III, <u>The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism</u>, 39 STAN. L. REV. 317, 335 (1987)).[22] Perpetuated in our society is the Black-as-criminal stereotype that links Black people with violence, dangerousness, and criminality. Cynthia Lee, <u>Making Race Salient: Trayvon Martin and Implicit Bias in a Not Yet Post-Racial Society</u>, 91 N.C. L. REV. 1555, 1580-81 (2013); <u>see also</u> Reyna Araibi, Note, <u>"Every Rhyme I Write": Rap Music as Evidence in Criminal Trials</u>, 62 ARIZ. L. REV. 805, 822 (2020) (discussing the acute effects of the Black-as-criminal stereotype, such that "[t]he mere presence of a Black man … can trigger thoughts that he is violent and criminal" and "[m]erely thinking about Blacks can lead people to evaluate ambiguous behavior as aggressive").

It follows that a court must also conduct its analysis with a close eye to the unique danger of implicit bias. <u>Berhe</u>, 193 Wn.2d at 657. To harbor implicit biases is to be human. <u>Id.</u> at 663. "'[W]e all live our lives with stereotypes that are ingrained and often unconscious, implicit biases that endure despite our best efforts to eliminate them.'" <u>Id.</u> (quoting <u>State v. Saintcalle</u>, 178 Wn.2d 34, 46, 309 P.3d 326 (2013) (plurality opinion), <u>abrogated on other grounds by</u> <u>City of Seattle v. Erickson</u>, 188 Wn.2d 721, 398 P.3d 1124 (2017)). Life simply cannot be navigated without the assistance of categories, schemas, and cognitive shortcuts. <u>Saintcalle</u>, 178 Wn.2d at 47 (citing

---

[22] Our state Supreme Court cites A. Leon Higginbotham Jr.'s and Elizabeth L. Earle's writings in <u>Monday</u>, 171 Wn.2d at 678-79 (citing Higginbotham, <u>supra</u>, at 545-51; Earle, <u>supra</u>, at 1222-23, 1222 n.67, 1223 n.71).

Antony Page, *Batson*'s Blind–Spot: Unconscious Stereotyping and the Peremptory Challenge, 85 B.U. L. REV. 155, 160-61 (2005)). It is these shortcuts that lead people to unknowingly discriminate. Id.

On race, we are not "'on average or generally, cognitively colorblind.'" Id. at 46 n.3 (quoting TASK FORCE ON RACE & CRIM. JUST. SYS., PRELIMINARY REPORT ON RACE AND WASHINGTON'S CRIMINAL JUSTICE SYSTEM 1, 19 (2011), http://www.law.washington.edu/About/RaceTaskForce/preliminary_report_race_criminal _justice_ 030111.pdf [https://perma.cc/6BV4-RBB8]. "'[P]eople are rarely aware of the actual reasons for their discrimination and will genuinely believe the race-neutral reason they create to mask it.'" Berhe, 193 Wn.2d at 663-64 (quoting Saintcalle, 178 Wn.2d at 49). This court has the responsibility not only to acknowledge the unique challenge presented by implicit bias but to "'rise to meet it.'" Id. at 664 (quoting Saintcalle, 178 Wn.2d at 49).

With this insight intact, we are to consider four factors identified by our state Supreme Court to guide our analysis: (1) the content and subject of the questions and statements, (2) the frequency of the remarks, (3) the apparent purpose of the remarks, and (4) whether the questions and statements were based on evidence or reasonable inferences in the record. Bagby, 200 Wn.2d at 793-94. I differ from the majority in my conclusions as to each of these factors. In applying the factors within the entire context of Bellerouche's trial, the prosecutor's repeated use of "beef" was an apparently intentional effort to appeal to jurors' potential racial bias to fill in a missing motive with a racialized image of a cold-blooded violent criminal, a thug, the type of person who would "sin again" in the memory of his right-hand man by shooting Robinson in the face at

point-blank range for no reason and who continued to shoot as Robinson fled for his life. To be clear, I do not suggest that using the term "beef" is always improper. Context matters. My examination of the four factors follows.

*A. Content and Subject of Prosecutor's "Beef" Remarks*

First, in considering the content and subject of the prosecutor's remarks, I observe that the exercise in semantics and etymology the majority relies on to discern the "general meaning" of "beef" effectively disregards the objective observer lens that a court must adopt to determine if a prosecutor's language is racially coded. See majority at 20-22.

The majority states a court should assess a prosecutor's words "in the first instance and when necessary" "by reference to the general meaning of the term found in a standard dictionary." Id. at 22. In doing so,[23] the majority distinguishes between the prosecutor's "beef" remarks and "other similar cases,"[24] wherein prosecutors' language "clearly invoked racial biases." Id. at 20. None of the cases the majority relies on hold that we must limit review of a prosecutor's rhetoric within the bounds of standard dictionaries. See id. at 22. In fact, the majority relies on cases that address issues of statutory interpretation, not prosecutorial misconduct claims. See majority at 20.[25] Notably, none of the majority's otherwise proffered race-based prosecutorial misconduct

---

[23] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 196 (2002). The majority also notes a similar definition and "famous etymology" from the Oxford English Dictionary. See majority at 21 n.8 (citing OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/beef_n2 (last visited Feb. 21, 2025)).

[24] The majority cites to Bagby, 200 Wn.2d at 795-96; Monday, 171 Wn.2d at 678-79; State v. Ibarra-Erives, 23 Wn. App. 2d 596, 606, 516 P.3d 1246 (2022); State v. McKenzie, 21 Wn. App. 2d 722, 723, 508 P.3d 205 (2022); Zamora, 199 Wn.2d at 703; and State v. Loughbom, 196 Wn.2d 64, 67, 470 P.3d 499 (2020).

[25] See State v. Watson, 146 Wn.2d 947, 954, 51 P.3d 66 (2002); State v. Gonzalez, 168 Wn.2d 256, 263-64, 226 P.3d 131 (2010); State v. Hammock, 154 Wn. App. 630, 635, 226 P.3d 154 (2010); State v. Myles, 127 Wn.2d 807, 813, 903 P.2d 979 (1995).

cases[26] relied on dictionary definitions to establish whether the prosecutor's challenged language was objectively racially tinged. See Bagby, 200 Wn.2d at 793-96; Monday, 171 Wn.2d at 676-78; Zamora, 199 Wn.2d at 712-21; State v. Ibarra-Erives, 23 Wn. App. 2d 596, 605-08, 516 P.3d 1246 (2022); State v. McKenzie, 21 Wn. App. 2d 722, 730-31, 508 P.3d 205 (2022).[27]

The question is not whether a word or phrase "unmistakably or exclusively," or even likely, has a racial connotation, as the majority suggests. Majority at 23. Rather, this court must determine if an objective observer aware of our nation's history of racial discrimination and implicit, institutional, and unconscious biases could[28] recognize in the context of Bellerouche's trial that the prosecutor's use of "beef" constituted an allusion to negative biases or stereotypes about the Black community. See Bagby, 200 Wn.2d at 802; Zamora, 199 Wn.2d at 718. Accordingly, the state Supreme Court has instructed courts not to presume that language capable of evoking racist stereotypes has no effect on them or the jurors. Henderson, 200 Wn.2d at 439.

Monday, 171 Wn.2d 667, Zamora, 199 Wn.2d 698, and Bagby, 200 Wn.2d 777, provide instructional examples of applications of the objective observer framework to

---

[26] Notably, in Loughbom, 196 Wn.2d at 67, the state Supreme Court addressed a general prosecutorial misconduct allegation. The majority's comparison of the instant matter with a decision that was not analyzed according to a race-based framework is perhaps indicative of the contextual considerations that are otherwise absent from the majority's opinion. See majority at 20.

[27] In McKenzie, 21 Wn. App. 2d at 733-34, this court held that the prosecutor's use of "gorilla pimp" constituted race-based prosecutorial misconduct. We referred to dictionary definitions of "gorilla" and "guerilla" in our determination that the State's claim that the court reporter mistakenly transcribed the prosecutor's use of "guerilla pimp" as "gorilla pimp" was, in the context of the relevant testimony, unconvincing. Id. at 731, 731 n.8.

[28] This court has previously held that in assessing the impact of the injection of racial appeals into a trial, "could" does not mean always. Simbulan v. Nw. Hosp. & Med. Ctr., 32 Wn. App. 2d 164, 177, 183, 555 P.3d 455 (2024). We more recently clarified that "could" means a "reasonable possibility." Al Hayek v. Miles, No. 39989-3-III, slip op. at 9 (Wash. Ct. App. Jan. 30, 2025), https://www.courts.wa.gov/opinions/pdf/399893_pub.pdf.

discern the content and subject of a prosecutor's remarks.

In Monday, in a case where "[w]itness credibility was particularly at issue," our state Supreme Court held that, in an effort to discount the credibility of Monday's witnesses, the prosecutor's reference to "police" as "'po-leese'" was a subtle and impermissible appeal to jurors' racial bias used to emphasize the prosecutor's assertion that "'black folk don't testify against black folk.'" 171 Wn.2d at 671, 676, 678-79. In reference to the prosecutor's pronunciation of "'po-leese,'"[29] the court emphasized that "[n]ot all appeals to racial prejudice are blatant." Id. at 678. "Like wolves in sheep's clothing, a careful word here and there can trigger racial bias." Id. (citing Earle, supra, at 1222-23, 1222 n.67, 1223 n.71); see also Bagby, 200 Wn.2d at 795 (stating that "[s]tudies have shown that even the simplest racial cues can trigger implicit biases and affect the way jurors evaluate evidence"). Remarks referring to race may be blatant slurs, gratuitous, and ostensibly nonprejudicial references, or comments that serve a probative function. Earle, supra, at 1233.

To this end, the Zamora court held that prosecutor's references to immigration, border security, and crime invoked prejudices about Latinxs "'without ever saying Latin[x].'" 199 Wn.2d at 712-13 (alteration in original). The court observed that the remarks were not remotely related to the charges against Zamora. Id. at 719. Additionally, the court stressed our nation's historic and continued discrimination against

---

[29] The prosecutor's "po-leese" pronunciation in Monday, nowhere to be found in the dictionaries the majority cites, demonstrates how ill-fitting the majority's generalized definitional analysis is to a racial appeal inquiry. Monday, 171 Wn.2d at 679. This nation's evolving culture of racial prejudice and racial coding is not possibly captured in the pages of a dictionary. See Praatika Prasad, Note, Implicit Racial Biases in Prosecutorial Summations: Proposing an Integrated Response, 86 FORDHAM L. REV. 3091, 3097-99, 3104 (2018). See generally Deirdre Pfeiffer & Xiaoqian Hu, Deconstructing Racial Code Words, 58 L. & SOC'Y REV. 294 (2024).

Latinxs, including in national media rhetoric. Id. at 719-20. The court held that the prosecutor's remarks were apparently intended to appeal to stereotypes about illegal Latinx immigrants engaged in crime, thus reflecting poorly on Zamora based on his perceived ethnicity. Id. at 719.

Most recently, in Bagby, 200 Wn.2d at 800-01, the lead opinion rebuked, in addition to other instances of prosecutorial misconduct, see id. at 795-98, a prosecutor's questioning of Bagby regarding his dog.[30] The court observed, citing academic and social commentary sources, that the prosecutor's questioning could have evoked the harmful stereotype of Black men as being too dangerous and violent to properly care for dogs, thus potentially undermining Bagby's credibility and presumption of innocence. See id. at 800 (lead opinion of Montoya-Lewis, J.) (citing Kevin Blackistone, Opinion, Black Men and Dogs: Don't Believe Vick, NPR (Sept. 25, 2007), https://www.npr.org/templates/story/story.php?storyId=14698643; Ann Linder, The Black Man's Dog: The Social Context of Breed Specific Legislation, 25 ANIMAL L. 51, 57-68 (2018)).

The majority mischaracterizes Justice Stephens' concurrence in Bagby, joined by four justices, when it states that the five justices "appeared to caution against determining a word's meaning through pop culture references." Majority at 22. The majority correctly states the five justices disagreed with the lead opinion's holding that the prosecutor's references to Bagby's dog constituted race-based prosecutorial misconduct. Bagby, 200 Wn.2d at 804 (Stephens, J., concurring). The differences, however, were not based on the nature of the potential racial appeal,[31] but whether the

---

[30] See supra note 3.
[31] Justice Stephens stated, "While I can understand how a line of questioning about dogs, breeds of dogs, or animal abuse might play on racial stereotypes, the conclusion that an

record supported that such an apparently intentional appeal was made in the context of Bagby's trial. Id. at 804-05, 808. Justice Stephens observed the lead opinion omitted the fact that Bagby, not the prosecutor, first mentioned his dog when testifying to his friendship with the victim. Id. at 805-06. The five justices thus concluded the prosecutor's apparent purpose was to establish the victim's credibility by showing Bagby trusted her to watch his beloved dog. Id. at 805, 808. The five justices called attention to the need for a reviewing court to "look at the record as a whole and the context in which an objective observer would view the statements" when examining an allegation of a prosecutor's race-based misconduct. Id. at 807; see also id. at 805 n.12 ("As an appellate court, we consider the entire context of the statement.").

Unlike the prosecutor in Bagby, the prosecutor in the instant case introduced the term "beef" at trial and was the only person at trial to use it. The prosecutor's particular and repeated use of "beef" was consistent, each time juxtaposing "beef" with the alternative term of "argument" or "fighting."

At opening the prosecutor used "beef" to lay out the State's theory of the case, stating that Bellerouche viciously shot Robinson "point blank" in the face and that Robinson was unarmed and unsuspecting because "[t]here had been no argument" and "[t]here was no beef." The prosecutor proceeded to ask Robinson about any prior "beef" or "fighting" with Egger and "any beef or any argument with Crucial." Robinson denied both. The prosecutor later asked Bellerouche on cross whether he had any "arguments" or "beef" with Robinson, Egger, or Nguyen, which Bellerouche denied.

At closing the prosecutor again used the term "beef" during a recitation of

---

objective observer could find that occurred in this case is … unwarranted." Bagby, 200 Wn.2d at 808 (Stephens, J., concurring, with four justices joining) (emphasis added).

34

Robinson's testimony, proffering that Robinson was correct that "there were no arguments, no beefs between anybody at that parking lot that Mr. Bellerouche knew about." The prosecutor continued by asserting that the otherwise unexpected shooting was explainable because Bellerouche had "disdain" for Robinson and "Robinson meant nothing to [Bellerouche]."

In the context of an allegation against a Black defendant for committing gun violence against another Black man, the State's theory implied the jury could disregard the absence of an obvious motive because Bellerouche was simply a "cold-blooded" violent criminal. Consistent with this theory was the prosecutor's unsupported claim that Robinson was shot at "point blank" range. Similar to "beef," prosecutor used the word "point blank" multiple times throughout the course of Bellerouche's trial, including at opening, closing, and rebuttal. However, other than the evidence of the shooting of Robinson occurring in Nguyen's Audi and that he was shot in the face, the record is devoid of evidence that Robinson was shot at "point blank" range.[32]

It was in this context that the prosecutor repeatedly used "beef" in combination with "argument" or "fighting." The juxtaposition subtly suggests that "beef" means something more, something different than just an argument, fight, or some other generic disagreement. Unlike "fighting" or "argument," "beef" is commonly associated with Black hip hop and rap culture to refer to feuds between rappers, including rivalries that result in gun violence with tragic endings. See Craig Epstein, Note, Where's the Beef: The Use of Mediation to Resolve Disputes Between Rappers, 21 CARDOZO J. CONFLICT

---

[32] The State did not introduce any expert who could testify to the type of projectile that caused Robinson's injury, the trajectory or angles related to his injury, or whether Robinson was shot at point-blank range.

RESOL. 495, 495-506 (2020); Dorian Lynskey, Tupac and Biggie Die as a Result of East/West Coast Beef, THE GUARDIAN (June 12, 2011, 7:16 PM), https://www.theguardian.com/music/2011/jun/13/tupac-biggie-deaths. Common media coverage of criminal matters involving rap artists and "disputes, or 'beefs,' between prominent rap artists and their entourages" has contributed to the mainstream public's association of rap culture with "violent, deviant, and criminal behaviors." Andrea L. Dennis, Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence, 31 COLUMBIA J. L. & ARTS 1, 18 & n.111 (2007). Originating "as an expression of uniquely Black identity," "the unconscious understanding of rap music remains underpinned by notions of race and racial stereotypes about who criminals are, what they look like, and where they come from." Araibi, supra, at 810.

In pairing "beef" with sanitized terms for a disagreement or dispute, the prosecutor's particular and unnecessary use of "beef" could have primed jurors to pay more attention, even subconsciously, to Bellerouche's race and activated jurors' implicit biases to cause them to associate Bellerouche with stereotypes that position Black criminal defendants in worlds and lifestyles marked by crime and violence. See Bagby, 200 Wn.2d at 795-96; see also Ibarra-Erives, 23 Wn. App. 2d at 607-08 (holding that prosecutor's unnecessary use of street drug-dealing term "Mexican ounce" improperly suggested defendant was more likely to have unlawfully possessed or packaged drugs because of his apparent Latinx ethnicity).

In Bagby,[33] the justices agreed as to the understanding an appellate court must

---

[33] Notably, the trial court in the instant case did not have the benefit of our state Supreme Court's Bagby decision, which was decided in 2023 after Bellerouche's trial.
Further, it is worth emphasizing the unique ability and responsibility an appellate court has in analyzing a trial record when considering a prosecutorial misconduct claim. See Bagby,

have with regard to how implicit racial bias can be activated by coded rhetoric. See 200 Wn.2d at 794-95. The Bagby court observed that "even the simplest racial cues can trigger implicit biases and affect the way jurors evaluate evidence." Id. at 795. Indeed, subtle cues or references to racial identity and stereotypes can affect juror decision-making more than even explicit appeals.[34] Id.; Monday, 171 Wn.2d at 678-79. "Biases are often activated through the use of coded language or racial code words such as phrases or symbols that 'play upon race … [and] white Americans' negative views of [B]lack Americans—without explicitly raising the race card.'" Bagby, 200 Wn.2d at 794 (alterations in original) (quoting andré douglas pond cummings, Racial Coding and the Financial Market Crisis, 1 UTAH L. REV. 141, 217 (2011)). Coded language that evokes racial stereotypes can assist prosecutors in indirectly hurting a witness's credibility by identifying the witness as the "other." Mikah K. Thompson, Bias on Trial: Toward an Open Discussion of Racial Stereotypes in the Courtroom, 2018 MICH. ST. L. REV. 1243, 1263 (2018); see Bagby, 200 Wn.2d at 794-95 (discussing how racially coded language can distance defendants from jurors (citing Thompson, supra, at 1257)).

In the context of the instant case, the prosecutor's use of "beef" could have distanced Bellerouche from the jury by playing on "the perceived negative qualities and

---

200 Wn.2d at 791-93; Zamora, 199 Wn.2d at 717. The trial court necessarily responds to objections and issues as they arise in the course of trial. The context of the trial is thus unfolding as the trial comes to life. On review, an appellate court has the retrospective ability to consider the entire story of the trial cover to cover to determine whether a defendant's right to a fair trial has been compromised by misconduct. See Zamora, 199 Wn.2d at 704. We must not take this duty lightly. Berhe, 193 Wn.2d at 664.

[34] This risk equally applies to judges. See Andrew S. Pollis, The Appellate Judge as the Thirteenth Juror: Combating Implicit Bias in Criminal Convictions, 95 TEMP. L. REV. 1, 13 (2022). See generally Jeffrey J. Rachlinski et al., Does Unconscious Racial Bias Affect Trial Judges?, 84 NOTRE DAME L. REV. 1195 (2009).

dangerousness of Black … communities,"[35] so as to evoke "a conception of 'us' versus 'them.'" Bagby, 200 Wn.2d at 794. Such "othering"[36] can interfere with jurors' ability to properly consider evidence by suggesting that Black defendants are "inherently different," "deserve less sympathy,"[37] and are "'generally outliers in the moral, civilized, and law-abiding society to which the jurors themselves belong.'" Thompson, supra, at 1257 (quoting Montré D. Carodine, "The Mis-Characterization of the Negro": A Race Critique of the Prior Conviction Impeachment Rule, 84 IND. L.J. 521, 570 (2009)).

The majority reasons that because the prosecutor asked both Robinson and Bellerouche whether any "beef" existed before the shooting, the prosecutor's use of "beef" could not objectively create the appearance of an "us-versus-them" narrative. Majority at 24. The majority also states that because Robinson and the trial judge were also Black, it is "incoherent" to conclude that the prosecutor used the term "beef" "to 'suggest Black defendants are inherently different from white jurors and deserve less sympathy,'" because "[t]o do so would have deprived the victim and the presiding judge of their humanity as well." Id. (quoting Bagby, 200 Wn.2d at 794).

The majority's rationale centers on a comparison of Bellerouche's trial to the civil trial at issue in Henderson, 200 Wn.2d at 435, wherein the Washington Supreme Court

---

[35] Prasad, supra, at 3107-09.

[36] "Othering" is defined in an article cited by the Bagby court, 200 Wn.2d at 795, as "'a process by which individuals and society view and label people who are different in a way that devalues them.'" Thompson, supra, at 1263 (quoting Susan J. Stabile, Othering and the Law, 12 U. ST. THOMAS L. J. 381, 382 (2016)). "When individuals engage in 'othering,' they 'determine that certain people are not us, and that determination functions to create ... a devalued and dehumanized Other, and a distancing of the other from ourselves.'" Thompson, supra, at 1263 (alteration in original) (quoting Stabile, supra, at 382-83).

[37] Bagby, 200 Wn.2d at 794 (citing Prasad, supra, at 3108; Thompson, supra, at 1257).

applied a similar objective observer standard[38] to determine whether a civil litigant established a prima facie case showing that race could have been a factor in a civil verdict. See majority at 23-24. The court held that Henderson established Thompson's defense counsel impermissibly relied on racial stereotypes and determined that, in considering the totality of the circumstances of the trial, an objective observer could conclude that racism affected the verdict. Henderson, 200 Wn.2d at 439. As the majority cites, see majority at 23, the Henderson court observed that "[t]he only Black people in the courtroom" were Henderson herself, her lawyer, and her lay witnesses. 200 Wn.2d at 423.

The majority's comparison is inapt. At issue in Henderson was whether Henderson presented a prima facie case to require the trial court to grant Henderson an evidentiary hearing on her motion for a new trial. Id. at 439-40; see GR 37. The Henderson court explained that at such a hearing, "the trial court is to presume that racial bias affected the verdict, and the party benefiting from the alleged racial bias has the burden to prove it did not." Id. at 435. No such burden-shifting between the State and a criminal defendant occurs in the context of a race-based prosecutorial misconduct allegation. Rather, the appellate court should be concerned as to whether an objective observer could conclude that a prosecutor's appeals to racial bias could have undermined the credibility or presumption of innocence of the criminal defendant so as to categorically deprive the defendant of their fair trial right to an impartial jury. Bagby, 200 Wn.2d at 787-89.

---

[38] The Henderson court held, "[U]pon a motion for a new civil trial, courts must ascertain whether an objective observer who is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State could view race as a factor in the verdict." 200 Wn.2d at 435 (citing Berhe, 193 Wn.2d at 665).

In the instant case, although the prosecutor may have also drawn jurors' attention to Robinson's race by using the term "beef," this does not negate the reasonable possibility that the prosecutor's racially coded language <u>could</u> have also impacted jurors' decision-making processes as to Bellerouche's guilt by "othering" him to a stereotypically Black world of violence and criminality. <u>See</u> <u>id.</u> at 793; <u>Al Hayek v. Miles</u>, No. 39989-3-III, slip op. at 8-9 (Wash. Ct. App. Jan. 30, 2025), https://www.courts.wa.gov/opinions/pdf/399893_pub.pdf. The "othering" that occurs is not necessarily between the accused and the victim, but between the accused and the jury. <u>See</u> <u>Bagby</u>, 200 Wn.2d at 794-95.

I also disagree with the majority's statement that Bellerouche could not have been feasibly "othered" from the jury because he was not the only Black person in the courtroom. <u>See</u> majority at 24. This claim fatally ignores the reality of ingrained prejudices against Black criminal defendants that has contributed to our nation's mass incarceration of people of color.[39] <u>See</u> Araibi, <u>supra</u>, at 822, 838; Paige M. Walker, Comment, <u>Restricting the Use of Rap Lyrics as Evidence in Courts: A Targeted Approach to Tackling Discrimination in Criminal Procedure</u>, 28 Lewis & Clark L. Rev. 431, 446 (2024).

Additionally, the tone of the majority's reasoning suggests that it would have been nonsensical for the prosecutor to appeal to jurors' potential racial bias when such conduct would dehumanize the victim and trial judge as well. <u>See</u> majority at 24. This is untenable. First, the prosecutor's subjective intent is not considered in a race-based

[39] I note the majority's indirect implication that otherwise injected racial appeals are permissible as long as they are spread out beyond the defendant is profoundly troubling. We must not veer toward allowing racism in moderation. "'[T]heories and arguments based upon racial, ethnic and most other stereotypes are antithetical to and impermissible in a fair and impartial trial.'" <u>Monday</u>, 171 Wn.2d at 678 (quoting <u>State v. Dhaliwal</u>, 150 Wn.2d 559, 583, 79 P.3d 432 (2003) (Chambers, J., concurring)).

prosecutorial misconduct analysis.[40] See Bagby, 200 Wn.2d at 792-93. Second, the objective observer is aware that the victim, Robinson, admitted to bringing a gun to the business plaza parking lot, using cocaine, being high, initially saying that he did not get a good look at who shot him, and lying about how he was shot. The objective observer is also aware that the only evidence that Bellerouche was the shooter was Robinson's testimony. Therefore, before the jury was a credibility battle between Bellerouche, a Black defendant, and his alleged victim. It is in this context that the objective observer could conclude that the prosecutor apparently intentionally appealed to jurors' potential racial bias to undermine Bellerouche's credibility to tip the jury's favor toward Robinson or to weaken Bellerouche's presumption of innocence that he was due as the defendant. Lastly, whether conduct appeals to jurors' racial bias is not determined by the racial make-up of the courtroom. Implicit bias transcends race.[41] See id. at 791-92;

---

[40] Additionally, the majority seems to suggest that a lack of objection to the prosecutor's "beef" remarks cuts against Bellerouche's race-based misconduct claim. See majority at 24. This contention flies in the face of the rule that "inaction by defense counsel cannot excuse a prosecutor's misconduct." Zamora, 199 Wn.2d at 717. "Unlike the rules for general prosecutorial misconduct, the rule for race-based prosecutorial misconduct does not differentiate between a defendant who objects and one who does not object." Id. Indeed, the case that the majority cites addressed a general (non-race-based) prosecutorial misconduct claim. See majority at 24 (citing State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)). The State concedes that an objection is not required to preserve a race-based prosecutorial misconduct claim for appeal. Wash. Ct. of Appeals oral argument, State v. Bellerouche, No. 84887-9-I (Sept. 13, 2024), at 10 min., 26 sec. to 10 min., 32 sec., video recording by TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?clientID=9375922947&eventID=2024091211.

[41] The State argues in its briefing that the prosecutor's use of "beef" necessarily cannot appeal to racial bias because "it is common" and "in fact, it is the title of a popular Netflix series that begins with a 'road rage' incident between two random people, neither of whom is Black." First, the multicultural adoption of a term does not negate the fact that it could appeal to a juror's specific implicit racial bias. See Berhe, 193 Wn.2d at 658 ("[A]llowing bias or prejudice by even one juror to be a factor in the verdict violates a defendant's constitutional rights and undermines the public's faith in the fairness of our judicial system."). Second, as Bellerouche points out in his reply brief, the State's cultural example illustrates the association between "beef" and violence. Indeed, the show, as noted by Bellerouche, features escalating violence, including gun violence. See Alex Abad-Santos, Beef is the Best Show Netflix Has Had in Recent Memory,

see also Lindsay Perez Huber et al., Naming Racism: A Conceptual Look at Internalized Racism in U.S. Schools, 26 CHICANA/O-LATINA/O L. REV. 183, 183-84, 186 (2006) (discussing the concept of internalized racism).

*B. Frequency*

In considering whether a prosecutor apparently intentionally appealed to jurors' racial bias, a reviewing court should consider whether the prosecutor's remarks or questions were isolated incidents. See Bagby, 200 Wn.2d at 796; Zamora, 199 Wn.2d at 719; Monday, 171 Wn.2d at 678. In its analysis of the frequency factor, the majority states the prosecutor's use of "beef" did not play any significant role in the State's theory. Majority at 25-26. Again, I disagree and believe the majority's conclusion is erroneous for lack of contextual considerations. See id.

Here, the prosecutor used "beef" five times[42] throughout Bellerouche's trial in an objectively strategic manner. See Loughbom, 196 Wn.2d at 76. By introducing "beef" early in opening and referring back to it in closing, the prosecutor presented a racially driven prism through which the jury should view the evidence. See id.; State v. Ramos, 164 Wn. App. 327, 340-41, 263 P.3d 1268 (2011). Likewise, the prosecutor punctuated the trial at key points by reinforcing the racially tied term when examining both Bellerouche and Robinson. This is not a case where the prosecutor inadvertently uttered the word "beef" or where the remarks were one-off or isolated occurrences. See

---

VOX (Apr. 12, 2023, 7:00 AM), https://www.vox.com/culture/2023/4/12/23680055/netflix-beef-review-ending-explained-season-2-emmy-award-winning.

[42] As the majority observes, the prosecutor used the term "beef" a sixth time, but to ask Robinson if the Chinese restaurant at the business plaza had "Mongolian beef." Neither party cites this use of "beef" in its argument, and the prosecutor's question had no apparent connection to the substantive questioning regarding the shooting. The prosecutor quickly changed topics after Robinson's response, "They do [have Mongolian beef]."

Bagby, 200 Wn.2d at 793; Zamora, 199 Wn.2d at 719.

C. *Apparent Purpose*

The majority correctly characterizes the third factor as requiring a reviewing court to consider how an objective observer "could understand the purpose of the" prosecutor's "beef" remarks. Majority at 26 (internal quotation marks omitted) (citing Bagby, 200 Wn.2d at 796); see also Zamora, 199 Wn.2d at 719-21 (applying the objective standard). The majority, however, dismisses Bellerouche's identification of problematic evidentiary arguments as not connected to the prosecutor's use of "beef" and, in doing so, critically fails to consider the larger trial narrative in which the remarks were made. See majority at 22 n.9. The majority fails to apply the test as directed by our state Supreme Court that requires this court to assess an allegation of race-based prosecutorial misconduct within the entire context of the trial. Zamora, 199 Wn.2d at 718; Bagby, 200 Wn.2d at 807 (Stephens, J., concurring, with four justices joining). This "include[s] the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" Monday, 171 Wn.2d at 675 (internal quotation marks omitted) (quoting State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)).

Here, the record shows that the apparent purpose of the prosecutor's use of "beef" was not simply to establish the circumstances of the crime as the majority holds. See majority at 26. Rather, the objective observer could conclude that the "beef" remarks were among the breadcrumbs dropped by the prosecutor to lead jurors down a path to fill an obvious gap in the State's evidence—why would Bellerouche shoot Robinson? That path involved apparently intentionally appealing to jurors' racial bias to

43

fill in a missing motive with an image of a cold-blooded violent criminal, a thug, the type of person who would "sin again" in the memory of his right-hand man by shooting Robinson in the face at point-blank range for no reason and who continued to shoot as Robinson fled for his life.

At opening the prosecutor teed up the memorial video from Egger's cell phone that the State later introduced, played for the jury, and admitted into evidence. The prosecutor told the jury they would "see somebody who <u>looks an awful lot</u> like Bernard Bellerouche carrying an object that <u>looks an awful lot</u> like a firearm." (Emphasis added.)

Defense told the jury that Bellerouche was sad about the loss of his best friend, Whitney, or "T.C.," who had died the year before. On direct Bellerouche expressed that he was not initially planning to go to Whitney's memorial "because it was a sad situation for me to relive." The prosecutor later circled back to Bellerouche's emotional state and elicited from Bellerouche that he was feeling sad on the birthday of his friend and "right-hand man" Whitney. When Bellerouche described Whitney as his "best friend," the prosecutor was apparently not satisfied and followed up by saying, "And your right-hand man was the phrase I was using." The prosecutor then pointed out that Bellerouche's tattoo of "TC" was located on his right hand and that Bellerouche referred to Whitney as his "right-hand man" in text messages. Earlier at trial, the prosecutor admitted without objection a photo of Bellerouche's hand with the "TC" tattoo. <u>See</u> Ex. 68.2.

The prosecutor, over defense objection, played for the jury the audio of the memorial video that included Lil Wayne's entire rap song *I Miss My Dawgs*. <u>See</u> Ex. 65, at 1 min., 12 sec. to 5 min., 30 sec. The reason the prosecutor gave for playing the song audio evolved. The State first argued that the audio was needed to capture the sounds

of "somebody ask[ing] '[A]re you off to Aurora?'" and liquid being poured out of what the

prosecutor believed was the Remy Martin cognac bottle later found at the scene of the

shooting. After the trial court pointed out that both those sounds occur outside the

song's playing time, the prosecutor argued that the full audio was needed because it

captured the sound of a car door closing after the Black man in the blue shirt walks in

front of the BMW toward the driver's side and out of view. This is the same man alleged

by the State to be Bellerouche who "appeared" to be holding a firearm earlier in the

video. See Ex. 65, at 0 min., 52 sec. to 0 min., 54 sec.; 1 min., 58 sec. to 1 min., 59 sec.

But the audio does not capture the sound of a car door closing near the time the Black

man in the blue shirt walks across the screen at 2 minutes and 15 seconds as argued

by the prosecutor. During the song, at 4 minutes and 57 seconds, the video shows the

Black man in the blue shirt walking a distance away from the vehicle. Ex. 65. When the

Black man in the blue shirt is shown again walking across the screen, it is more than 4

minutes after the song ends. Ex. 65, at 8 min., 43 sec.

Although Bellerouche does not challenge the admission of the song audio on

appeal,[43] its playing at trial is nonetheless part of the context within which this court

---

[43] With regard to defense's pretrial motion argument that the song artist Lil Wayne publicly boasts about his own gang involvement, the trial court seemed to suggest that because "a number of the jurors are not affiliated with gangs," those jurors who recognize Lil Wayne as the artist may not necessarily "associate anyone that listens to that music with gangs."
     Although not at issue on appeal, the court's comment brings to light an important distinction in assessing the risk of potential bias in a trial. The question is not whether a piece of evidence or remark should categorically activate or always appeals to a juror's potential prejudice, but whether it is reasonably possible that it could pose a prejudicial risk to a juror's perception of the defendant. See Berhe, 193 Wn.2d at 665-66; Al Hayek, slip op. at 9. A determination of potential prejudice is not a value-based judgment or a mind-reading test. See Simbulan, 32 Wn. App. 2d at 177. This is antithetical to the nature of implicit bias, which is unintended and operates in our subconscious regardless of any active suppression that is conformed to any postracial socially acceptable concepts. Berhe, 193 Wn.2d at 663-64; Page, supra, at 160-61; Lee, supra, at 1559. In an effort to fully recognize reasonably possible injections of prejudice into a trial, courts must operate from a standpoint of understanding the

should examine the prosecutor's strategic use of the term "beef." The majority relegates the State's entire memorial video exhibit to a footnote, stating that an appellate court does not generally "'apply the concept [of prosecutorial misconduct] to the introduction of evidence.'" Majority at 29 n.12 (alteration in original) (quoting State v. Kelly, 32 Wn. App. 2d 241, 260, 555 P.3d 918 (2024)). This is misleading. Although this court has stated that such challenges are more appropriately addressed in an evidentiary error legal framework, Kelly, 32 Wn. App. 2d at 260, we analyze a race-based prosecutorial misconduct claim within the full context of the trial based on a detailed examination of the entire record.[44] Zamora, 199 Wn.2d at 704, 715-16, 718; Monday, 171 Wn.2d at 675; Bagby, 200 Wn.2d at 807 (Stephens, J., concurring, with four justices joining). Indeed, an appellate court's responsibility is to assume the benefit of 20/20 hindsight to determine whether, given the full view of the State's trial presentation, the prosecutor's conduct could be objectively viewed as a racial cue to the jury.[45] Bagby, 200 Wn.2d at 791-93; Zamora, 199 Wn.2d at 715-17.

Here, as a result of the entire rap song being played at trial, the jury heard the lyric "Me and you to the very end, for only you I'll sin again" loudly six times. Ex. 65, at 2 min., 37 sec. to 2 min., 41 sec; 2 min., 49 sec. to 2 min., 53 sec.; 3 min., 51 sec. to 3

---

imperfect reality of the world we all live in and that, despite efforts to dispel them, we as humans are all susceptible to the dangerous associations and stereotypes that persist in our shared society. See Berhe, 193 Wn.2d at 664-65.

[44] The State conceded to this test at oral argument. Wash. Ct. of Appeals oral arg., supra, at 17 min., 35 sec. to 18 min., 13 sec.

[45] The majority also states that Bellerouche did not explain how the State's actions were not in good faith to establish the apparent racialized purpose of the prosecutor's "beef" remarks. Majority at 22 n.9. But subjective intent is irrelevant to this court's analysis of a race-based prosecution allegation. Zamora, 199 Wn.2d at 716; see, e.g., Ibarra-Erives, 23 Wn. App. 2d at 600-01, 607-08 (rejecting the State's argument that the prosecutor used the street drug-dealing term "Mexican ounce" in good faith). Our state Supreme Court has elaborated on the many reasons why. See Bagby, 200 Wn.2d at 791-92.

min., 54 sec.; 4 min., 04 sec. to 4 min., 07 sec; 5 min., 05 sec. to 5 min., 08 sec.; 5 min., 18 sec. to 5 min., 21 sec. They also heard the lyric "We thug." Ex. 65, at 4 min., 20 sec. to 4 min., 21 sec. See Praatika Prasad, Note, Implicit Racial Biases in Prosecutorial Summations: Proposing an Integrated Response, 86 FORDHAM L. REV. 3091, 3098 (2018) (cited in Bagby, 200 Wn.2d at 794) (identifying the word "thug" as racially coded language). An objective observer could conclude that these lyrics were apparently intentionally played to insinuate, in alignment with the State's theory, that the shooting was done in commemoration of the death of Bellerouche's "right-hand man" whom he was grieving.

It is well documented that "the image that predominates rap music in the public eye is that of the stereotypical gangster, thug, outlaw, or criminal." Dennis, supra, at 18; see also, e.g., Walker, supra, at 443-46; Vidhaath Sripathi, Note, Bars Behind Bars: Rap Lyrics, Character Evidence, and State v. Skinner, 24 J. GENDER RACE & JUST. 207, 218-19 (2021). Prosecutors may interject rap lyrics into a case to leverage years of hostile media coverage and negative stereotypes toward rap to impute a negative reflection onto the defendant's character or to "shore up a case." Jack Lerner, Rap on Trial: A Brief History, 27 CHAP. L. REV. 405, 425 (2024); see also Thompson, supra, at 1269-70 (discussing the possible dangerous prejudicial effects caused by racial stereotypes associated with rap music and lyrics).

Here, by never defining what "beef" referred to and juxtaposing it with sanitized terms for an otherwise generic "argument" or "fight," the prosecutor effectively cleared the way for the jury to associate the word "beef" with other objectively odious breadcrumbs to reinforce the stereotype that Bellerouche, because he is Black, was

more likely to have ruthlessly shot Robinson for no reason other than to "sin again" as a commemorative act for his dead friend.

Also contributing to this troubling context was detectives' testimony that the Black man in the blue shirt shown in the memorial video "appeared" to look like Bellerouche and that he held an object that "appeared" to be a firearm. The prosecutor introduced this testimony despite the fact detectives had the ability to enhance the video to rule in or rule out whether the object was a gun but chose not to do so. See Ex. 78. Why risk ruling out potential evidence? The prosecutor's introduction of the detectives' opinion testimony objectively appeals to the biased notion that an unidentified object in a Black man's hand is likely to be a firearm. See Lee, supra, at 1580-86, 1582 n.164 (discussing the Black-as-criminal stereotype in the context of shooter bias studies that "provide strong evidence that individuals are quicker to associate Black individuals with weapons [rather than, for example, harmless tools] and to perceive Blacks as armed and dangerous, regardless of whether they are actually armed and dangerous").

Another nefarious breadcrumb consisted of the prosecutor's questioning of Bellerouche that baselessly implied he was a drug dealer. The prosecutor asked Robinson whether he did cocaine in the parking lot. While Robinson testified that he used cocaine, he did not testify that he bought it from Bellerouche. Robinson instead testified that both Bellerouche and Nguyen had cocaine and he, Robinson, "even purchased some from [Nguyen]." Still, the prosecutor told Bellerouche on cross, "[Robinson] also testified that he bought some cocaine from you." After Bellerouche, who presumably heard Robinson testify, responded by saying that that was not true, the prosecutor followed up by asking, "I'm asking if you are testifying 'I know I did not sell

48

cocaine to Terrance Robinson,' or are you saying 'It's not true. I never sell cocaine'?" Bellerouche answered, "I've never sold cocaine to Terrance Robinson." The exchange left the subtle innuendo that Bellerouche was a drug dealer.

It is in this context of the entire trial that an objective observer could conclude the prosecutor's use of "beef" was apparently intentionally used to activate jurors' racial bias based on stereotypes that associate Black defendants with criminality and culpability based on their race. See Cynthia Kwei Yung Lee, Race and Self-Defense: Toward A Normative Conception of Reasonableness, 81 MINN. L. REV. 367, 403-05, 409-12 (1996) (discussing the "entrenched" Black-as-criminal stereotype).

The prosecutor's closing argument expressly highlights the challenges the State faced to convince the jury to believe Robinson over Bellerouche. The prosecutor first argued that Robinson "might be different from an average Seattle juror" and he was "not pretending to be a straight-laced boy scout hanging out on Aurora at 2:30 a.m." The prosecutor continued, "[Robinson is] familiar with cocaine and guns." Given the risk that this evidence could tip the credibility scale in favor of Bellerouche so as to fatally undermine the State's case, an objective observer could determine that the prosecutor's racially coded "beef" remarks could awaken jurors' potential bias to undermine Bellerouche's credibility and tip the scale back toward Robinson. See Bagby, 200 Wn.2d at 791-92, 802.

*D. Basis in Evidence*

The fourth and final factor requires a court to consider whether the alleged misconduct was relevant to the defendant's charges, relevant to the facts of the case, or was otherwise based on evidence in the record. Id. at 797.

The majority concludes that the prosecutor employed the term "beef" to establish the circumstances around the crime. Majority at 26, 28. I disagree. First, a prosecutor's race-based misconduct is not excused by a race-neutral explanation. See Berhe, 193 Wn.2d at 666. Second, if the prosecutor's purpose was only to establish the circumstances around the crime, the prosecutor could have simply limited the remarks or questions to the sanitized terms of "argument" or "fight." See Bagby, 200 Wn.2d at 795-96; Monday, 171 Wn.2d at 679. Third, the prosecutor's remarks were not prompted by the facts of the case. The prosecutor's repeated, strategic use of the term "beef," in context, was not relevant to the defendant's charges or otherwise based on evidence in the record. There was no evidence of any "beef" between Bellerouche and Robinson, or any of the individuals who were present at the parking lot when the shooting occurred.

Finally, the majority analogizes the present case to this court's decision in Roberts, 32 Wn. App. 2d 571, also cited by the State. But Roberts is inapposite. In Roberts, this court held that "the prosecutor's apparent purpose for eliciting the testimony was to show that [the defendant] was describing the circumstances of the burglary in his music video and rap lyrics" that objectively contradicted defense's theory. Id. at 607. In the instant case, Bellerouche's defense did not present any theory or argument regarding a preceding "beef" that would objectively warrant the State's response, as was established in Roberts. See id. at 606-07. As stated above, the use of "beef" at Bellerouche's trial was introduced by the prosecutor at opening.[46] And the

---

[46] As the majority notes, the State filed a motion to supplement the record after oral argument. See majority at 29 n.11. The majority's decision to affirm Bellerouche's conviction rendered the motion moot. See id. I would deny the State's motion. The State requested to file an explanation as to why the prosecutor used "beef" at trial that relied on facts outside of the record. First, where the claim is brought on direct appeal, the reviewing court will not consider matters outside the trial record. State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

prosecutor's continued use of "beef" was not in response to any evidence presented during the course of trial. See Bagby, 200 Wn.2d at 793, 797. The only time that "beef" was uttered during trial was by the prosecutor.[47]

For the foregoing reasons, based on a close review of the prosecutor's challenged conduct in the context of Bellerouche's entire trial, I would hold that Bellerouche met his burden of establishing that the prosecutor's repeated and strategic use of the term "beef" was an apparently intentional appeal to jurors' potential racial bias that undermined Bellerouche's credibility and presumption of innocence. Such race-based prosecutorial misconduct is per se prejudicial. Id. at 786 n.5. I would thus reverse Bellerouche's conviction on this basis and remand for a new trial.

<u>Evidentiary Challenge</u>

The majority finds no abuse of discretion in the trial court's admission of the December 2020 photos of Bellerouche wearing the "Hennything Is Possible Tonight" T-shirt that depicts a mostly bare bottom next to a Hennessey bottle. Majority at 11-12. I disagree. Any ostensible relevance is based on speculation. Even assuming arguendo that the photos were minimally relevant, any such relevance is substantially outweighed by the danger of unfair prejudice. Where some may describe the image as "'cheesy'" and "lightly embarrassing," as the majority does here, see id. at 12, others could

---

Second, because this court should analyze race-based prosecutorial misconduct from an objective standpoint, the subjective reasons behind the prosecutor's use of "beef" at trial are irrelevant to this court's inquiry. See Bagby, 200 Wn.2d at 791-92.

[47] I am perplexed by the majority's statement that the prosecutor's use of "beef" was "derived" from Robinson and Bellerouche's testimony. See majority at 28. The prosecutor introduced the term "beef" at opening and, as I state above, continued to unilaterally introduce the term throughout the trial. Neither Robinson nor Bellerouche used the term during their testimony. How Robinson or Bellerouche can then take ownership for the prosecutor's use of "beef" at trial is unclear.

describe the image as objectifying women and agree with defense that the photos improperly cast Bellerouche in a negative light laced with misogyny. I would thus hold that the trial court abused its discretion by admitting the photos and that the error was not harmless. Accordingly, I also would reverse Bellerouche's conviction on this basis.

As the majority states, a trial court's decision to admit evidence should not be overturned absent a manifest abuse of discretion. State v. Neal, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001); State v. Rice, 48 Wn. App. 7, 11, 737 P.2d 726 (1987). A trial court abuses its discretion when its decision is manifestly unreasonable, exercised on untenable grounds, or exercised for untenable reasons. State v. Broussard, 25 Wn. App. 2d 781, 787, 525 P.3d 615 (2023). A court's decision is manifestly unreasonable if it is "outside the range of acceptable choices given the facts and the legal standard." State v. Rundquist, 79 Wn. App. 786, 793, 905 P.2d 922 (1995). In other words, abuse of discretion occurs not where the issue could be decided differently but where "'no reasonable person would take the view adopted by the trial court.'" State v. Salgado-Mendoza, 189 Wn.2d 420, 427, 403 P.3d 45 (2017) (emphasis omitted) (internal quotation marks omitted) (quoting State v. Perez-Cervantes, 141 Wn.2d 468, 475, 6 P.3d 1160 (2000)).

A.  Background

The trial court admitted the photos over defense objections that the photos were not relevant, and even if they were minimally relevant, any relevance was substantially outweighed by the danger of unfair prejudice.

At trial, after defense counsel moved to exclude the photos outside of the presence of the jury, the State argued:

> [O]ne of the ways that the State is identifying Mr. Bellerouche as present at the scene of this crime is that his fingerprints were left on a cognac bottle. There is testimony that Mr. Bellerouche – this testimony came in through Mr. Robinson that Mr. Bellerouche was one of the people drinking cognac on the night of this shooting. The fact that Mr. Bellerouche is later arrested wearing a cognac t-shirt, a t-shirt indicating – well, it's a brand of cognac. It's a separate brand, but it's still the same drink. Is relevant. I think it makes it more probative, it makes it more likely that Mr. Bellerouche's prints would be left on a cognac bottle. It makes it more likely that the testimony that he was drinking cognac on the night of the shooting is credible testimony. So I think it is very relevant, and that is our theory of relevance.

Bellerouche challenged both the relevancy and prejudicial prongs of ER 403.

First, defense counsel asserted that the T-shirt was not relevant because Hennessy is a completely different brand of cognac than Remy Martin. Defense later added:

> To show a photo of a bare exposed bottom with a shirt with a totally different brand there's no value placed on why someone owns – these are all inferences the State is asking for the jury to draw, why someone buys the shirt, why someone wears the shirt, what that means.

Second, defense counsel argued that any probative value was outweighed by the highly prejudicial nature of the image, which showed Bellerouche "in a shirt with an exposed woman's bottom in it." Defense argued that there was alternative, less prejudicial evidence for the jury to consider:

> The State has [already] put on two of three fingerprint experts who are going to talk about Mr. Bellerouche's fingerprints on that [Remy Martin] bottle. That evidence is coming into court, has already come into court. … I think, if anything, maybe testimony from an officer saying, you know, when encountered, [Bellerouche] was wearing a shirt that had a Hennessy reference on it ….

Indeed, prior to the parties' arguments regarding the admissibility of the photos, which occurred after trial began, the State introduced testimony from two fingerprint examiners who testified that latent prints on the Remy Martin cognac bottle from the parking lot were identified to Bellerouche. Earlier, it had been communicated to the

53

court that the State planned to question a third fingerprint examiner. Additionally, at the time the court heard the motion to exclude, Bellerouche had already conceded in his opening statement that he was in the parking lot when the shooting occurred.

After hearing the parties' arguments, the trial court acknowledged that the T-shirt was for a different brand of cognac and the fact Bellerouche was "wearing the shirt doesn't necessarily mean that he drinks it," but determined that defense could address these disconnects through cross examination. The court also acknowledged "the shirt can be potentially considered by the jury as crude," but denied defense's motion to exclude. The trial court stated:

> The State is asserting in this case that the cognac bottle located at the alleged scene of the incident had Mr. Bellerouche's fingerprints on it and is attempting to show that Mr. Bellerouche enjoyed drinking Hennessy, a type of cognac. Even though it's a different brand and even though the fact that he's wearing the shirt doesn't necessarily mean that he drinks it, those are all things that certainly the defense is able to cross-examine and argue about. But in this particular case, it is relevant the fact that Hennessy, a cognac bottle was found at the scene.

The court granted the State's request to admit and publish to the jury both a CD and an 8.5 x 11-inch print of the images.

The photos of Bellerouche were referenced twice during trial. First, while publishing the photos to the jury, the prosecutor asked detective Rurey if it was Bellerouche depicted in the photos. The detective confirmed that it was. The prosecutor then asked, "He's wearing a 'Hennything is Possible Tonight' t-shirt. Is that correct?" Rurey agreed. The prosecutor then elicited from Rurey that Hennessy is a brand of cognac. Later during cross, the prosecutor asked Bellerouche whether he likes cognac, including Remy Martin and Hennessy. Despite Bellerouche answering in the positive, the prosecutor continued by having Bellerouche confirm he was wearing a Hennessy-

branded T-shirt when he was arrested in Arizona.

*B. ER 403*

*(i) Relevance*

Differing from the majority, I agree with Bellerouche's assertion that the connection between the Hennything Is Possible Tonight T-shirt and Bellerouche's presence at the scene of the shooting is "simply too attenuated." State v. O'Connor, 155 Wn.2d 335, 352, 119 P.3d 806 (2005).

Under ER 403, a trial court must determine if the probative value of relevant evidence is substantially outweighed by unfair prejudice. To do this, a court must first decide whether the evidence is relevant. Bengtsson v. Sunnyworld Int'l, Inc., 14 Wn. App. 2d 91, 105, 469 P.3d 339 (2020); see ER 402. Evidence that is not relevant is not admissible. ER 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. A logical nexus must exist between the evidence and the fact it is proffered to establish. State v. Burkins, 94 Wn. App. 677, 692, 973 P.2d 15 (1999). "Thus, the evidence must tend to prove, qualify or disprove an issue for it to be relevant." State v. Peterson, 35 Wn. App. 481, 484, 667 P.2d 645 (1983).

Here, with the understanding that the threshold to admit relevant evidence is very low and even minimally relevant evidence is admissible, State v. Darden, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002), it still strains credulity to conclude that Bellerouche wearing a T-shirt depicting a Hennessy bottle in Arizona in December 2020 makes it any more probable that he drank from a Remy Martin cognac bottle in a Seattle parking

lot in July 2020. By admitting photos of Bellerouche in the T-shirt, the fact finder is left to speculate that Bellerouche wears the shirt because he likes Hennessy and that because he likes Hennessy, he was drinking a different type of cognac one night four months ago. Relevancy is a low bar. Id. But it cannot be established by jumping through hoops of conjecture. See Peterson, 35 Wn. App. at 484-85 (affirming trial court's exclusion of evidence under ER 401).

Because the only minimal relevance was based on conjecture, the photos were not probative of any material fact. I would hold their admission was erroneous.

*(ii) Unfair Prejudice*

Assuming arguendo that the two photos of Bellerouche in the Hennything Is Possible Tonight T-shirt held any relevance, I would nonetheless hold that such relevance is substantially outweighed by the danger of unfair prejudice.

Under ER 403, evidence is barred if its probative value of relevance is substantially outweighed by unfair prejudice. "[E]vidence of 'scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect'" is not permitted. Carson v. Fine, 123 Wn.2d 206, 223, 867 P.2d 610 (1994) (quoting United States v. Roark, 753 F.2d 991, 994 (11th Cir. 1985)). Evidence is unfairly prejudicial if it is likely to stimulate a juror's emotional response rather than a rational decision. State v. Powell, 126 Wn.2d 244, 264, 893 P.2d 615 (1995); Rice, 48 Wn. App. at 13. In balancing the probative value against the potential prejudicial effect of the evidence, a court should consider

> "the importance of the fact of consequence for which the evidence is
> offered in the context of the litigation, the strength and length of the chain
> of inferences necessary to establish the fact of consequence, the
> availability of alternative means of proof, whether the fact of consequence

for which the evidence is offered is being disputed, and, where appropriate, the potential effectiveness of a limiting instruction."

State v. Bedada, 13 Wn. App. 2d 185, 193-94, 463 P.3d 125 (2020) (internal quotation marks omitted) (quoting State v. Kendrick, 47 Wn. App. 620, 628, 736 P.2d 1079 (1987)). "'[I]n doubtful cases the scale should be tipped in favor of the defendant and exclusion of the evidence.'" Powell, 126 Wn.2d at 264 (alteration in original) (internal quotation marks omitted) (quoting State v. Smith, 106 Wn.2d 772, 776, 725 P.2d 951 (1986)).

Under ER 403, "each case must be decided on the basis of its own facts and circumstances." Rice, 48 Wn. App. at 13. In applying ER 403, "the linchpin word is 'unfair,'" which "obligates the court to weigh the evidence in the context of the trial itself, bearing in mind fairness to both the State and defendant." State v. Bernson, 40 Wn. App. 729, 736, 700 P.2d 758 (1985). Unfair prejudice exists where evidence "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or 'triggers other mainsprings of human action.'" Carson, 123 Wn.2d at 223 (quoting 1 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE ¶ 403[03], at 403–36 (1985)). "[T]he balance may be tipped toward exclusion if the evidence is of minimal probative value or if the undesirable characteristics of the evidence are very pronounced." Rice, 48 Wn. App. at 13.

Images can sway jurors in ways that words cannot by triggering rapid unconscious responses. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 707-09, 286 P.3d 673 (2012) (plurality opinion). "Visual arguments 'manipulate audiences by harnessing rapid unconscious or emotional reasoning processes and by exploiting the fact that we do not generally question the rapid conclusions we reach based on visually

presented information.'" State v. Salas, 1 Wn. App. 2d 931, 946, 408 P.3d 383 (2018) (internal quotation marks omitted) (quoting Glasmann, 175 Wn.2d at 708). The speed "'by which we process and make decisions based on visual information conflicts with … [the] reasoned deliberation [that] is necessary for a fair justice system.'" Glasmann, 175 Wn.2d at 709 (quoting Lucille A. Jewel, Through a Glass Darkly: Using Brain and Visual Rhetoric to Gain a Professional Perspective on Visual Advocacy, 19 S. CAL. INTERDISC. L.J. 237, 293 (2010)). Therefore, as a basic principle, the State should not use images to communicate prejudicial statements about a defendant that are not supported by or inferable from the record. See McKenzie, 157 Wn.2d at 58. In short, "'[i]f you can't say it, don't display it.'" Salas, 1 Wn. App. 2d at 945 (quoting Kyle C. Reeves, PowerPoint in Court: The Devil's Own Device, or a Potent Prosecution Tool?, 48 PROSECUTOR, 33 Oct.-Dec. 2014, at 26).

Wearing clothes without transmitting nonverbal cues is virtually impossible. See Mohammad Aliakbari, Does It Matter What We Wear? A Sociolinguistic Study of Clothing and Human Values, 5 INT'L J. LINGUISTICS 34, 35 (2013). A person's dress can cause viewers to make decisions about the person's social background and moral character. Id. Researchers have reported that clothing "influences the credibility of individuals." Id. at 36.

Here, the photos of Bellerouche in a T-shirt featuring alcohol next to a woman's mostly bare buttocks and a slogan with a sexual innuendo created the risk of jurors viewing him negatively, including associating him with the objectification of women and related notions of misogyny.

The majority states that "[t]he [trial] court accurately described the [Hennything Is

Possible Tonight] shirt as 'crude.'" Majority at 11. The majority then dismisses Bellerouche's contention based on the T-shirt being merely "'cheesy'" and "lightly embarrassing." Id. at 12. The majority basically holds that a shirt with "a singular sexually suggestive image on it" cannot be sufficiently unfair to warrant an ER 403 violation. Id.

By virtue of being human, everyone is subject to cognitive biases based on our individual life experiences. Dale Larson, A Fair and Implicitly Impartial Jury: An Argument for Administering the Implicit Association Test During Voir Dire, 3 DEPAUL J. FOR SOC. JUST. 139, 143-47 (2010); Anna Roberts, (Re)forming the Jury: Detection and Disinfection of Implicit Juror Bias, 44 CONN. L. REV. 827, 864 & n.283 (2012). For this reason, a reviewing court should try its best to refrain from filtering the potential prejudicial effect of evidence through only its own subjective lens. See, e.g., State v. Cameron, 100 Wn.2d 520, 529, 674 P.2d 650 (1983) (concluding that evidence had an objectively prejudicial effect); Jeffrey J. Rachlinski & Andrew J. Wistrich, Benevolent Sexism in Judges, 58 SAN DIEGO L. REV. 101, 135 (2021) (discussing approaches and cognitive tools that judges can utilize to reduce the effect of implicit bias in their decisions); Courtney Fraser, Comment, From "Ladies First" to "Asking for It": Benevolent Sexism in the Maintenance of Rape Culture, 103 CAL. L. REV. 141, 180-84 (2015) (discussing evidentiary issues related to rape shield laws that can be manipulated based on gender biases or norms).

The majority recognizes the T-shirt as "sexually suggestive" and proceeds to rely on its own categorization of the T-shirt without consideration of how the various members of a jury could view it. Majority at 12; see Catherine Ross Dunham, Third

*Generation Discrimination: The Ripple Effects of Gender Bias in the Workplace*, 51 AKRON L. REV. 55, 90-92 (2017) (discussing the role of gender bias in judicial decisions). Indeed, the State in its briefing describes the T-shirt as "slightly risqué." In a society riddled with systemic sexism and misogyny,[48] the majority does not consider it is just as likely that one juror may not be impacted by the "crude" or "risqué" T-shirt as it is that another may be offended by it—or by the notion that someone would choose to wear it. See id. at 92-94 (stating that appellate judges are not immune from implicit bias and "[c]hanging habitual modes of thinking and acting on gender requires a concerted effort by the judiciary"); see also Jane L. Dolkart, *Hostile Environment Harassment: Equality, Objectivity, and the Shaping of Legal Standards*, 43 EMORY L.J. 151, 185-86 (1994) (stating that gender "stereotypes act to sanction male degradation and violence toward women and to trivialize their consequences" and "[s]ubstantial social science research supports the conclusion that gender has a strong effect on individuals' perceptions of what constitutes sexual harassment, with women significantly more likely than men to label conduct as harassing and offensive").

Moreover, the majority fails to consider, as required in an ER 403 inquiry, that there was ample alternative evidence[49] to place Bellerouche at the scene of the shooting and that, in fact, by the time the court considered the motion to exclude the photos, the State was aware that Bellerouche's presence in the parking lot was not disputed. See Bedada, 13 Wn. App. 2d at 194; State v. Johnson, 90 Wn. App. 54, 62, 950 P.2d 981 (1998) (citing ER 403 cmt.).

---

[48] Ann C. McGinley, *Misogyny and Murder*, 45 HARV. J. L. & GENDER 177, 228 (2022).
[49] The majority acknowledges this factor but fails to address it in its analysis. See majority at 10.

At opening defense counsel conceded Bellerouche's presence at the scene of Robinson's shooting.[50] Further, at the time the trial court considered Bellerouche's motion to exclude the photos, it was apparent to the court and the parties that the State had fingerprint evidence linking Bellerouche to the Remy Martin cognac bottle found in the parking lot. Even so, defense suggested that, if anything, an officer could testify that when the officer encountered Bellerouche he was wearing a shirt that had a Hennessy reference on it.

"While our standard of review provides great deference to the trial court's evidentiary rulings, it does not immunize them." Broussard, 25 Wn. App. 2d at 789. For the above reasons, I would hold that any minimal relevance of the photos of Bellerouche in the Hennything Is Possible Tonight T-shirt was easily substantially outweighed by the danger of unfair prejudice to render their admission an abuse of discretion.

*(iii)  Harmless Error*

To close, I agree with Bellerouche's argument that the trial court's erroneous admission of the photos cannot be harmless in a trial that boiled down to his word against Robinson's.

Because the trial court's erroneous admission of the photos was not one of a "constitutional mandate," this court applies the nonconstitutional harmless error test to

---

[50] In its briefing the State claims that this court cannot conclude that no reasonable person would have admitted the photo of Bellerouche wearing the Hennything Is Possible Tonight T-shirt "when a bottle of cognac was a key piece of evidence tied to the scene of the shooting." The State states it "had no way to know that Bellerouche would take the witness stand and admit drinking cognac." But, as the State purports in its briefing, the purpose of the bottle of cognac was to place Bellerouche in the parking lot where Robinson was shot. Therefore, the fact that defense had conceded Bellerouche's presence at the scene of the shooting at opening makes the State's argument untenable.

determine whether reversal is required. State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). Under the nonconstitutional harmless error test, this court's task is to determine whether it is reasonably probable that "had the error not occurred, the outcome of the trial would have been materially affected." State v. Cunningham, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980).

The nonconstitutional harmless error "analysis does not turn on whether there is sufficient evidence to convict without the inadmissible evidence." State v. Gower, 179 Wn.2d 851, 857, 321 P.3d 1178 (2014) (citing State v. Gresham, 173 Wn.2d 405, 433-34, 269 P.3d 207 (2012)). Rather, "[t]he improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." Bourgeois, 133 Wn.2d at 403 (emphasis added).

The State argues that any potential prejudice posed by the Hennessy T-shirt photos was "minimal when viewed against the backdrop of the entire trial" that consisted of graphic testimonies about Robinson's injuries, including his own testimony about the shooting. But the question in front of the jury was not whether Robinson was shot, but who shot him. And there simply was not overwhelming evidence as a whole that Bellerouche was the person who shot Robinson.

It is undisputed that Bellerouche was present in the parking lot when Robinson was shot. However, the video evidence and Robinson's own testimony establish that many people were in the parking lot leading up to and/or when the shooting occurred. See Ex. 17, at 2:02:34 a.m. to 2:04:54 a.m.; 2:16:44 a.m. to 2:16:55 a.m.; 2:26:14 a.m. to 2:26:22 a.m. Despite seeing that the vehicle in which Robinson was shot was already parked with people inside it at 2 a.m., police did not request security video that may

have captured any interactions or comings and goings prior to 2 a.m. And although Robinson was able to confirm some information about a potential witness who was in a car facing Nguyen's car when the shooting occurred, including that it was a person who came alone and was from out of town, Robinson claimed that he did not know who this person was and did not know their "government" name. Ultimately, with no other direct evidence to establish Bellerouche as the shooter, it was his word against Robinson's.

The majority's analysis, see majority at 13-15, disregards precedent wherein Washington courts have held that erroneously admitted evidence cannot be harmless in cases that are credibility contests. See, e.g., Gresham, 173 Wn.2d at 433-34; Gower, 179 Wn.2d at 858; State v. Eaton, 30 Wn. App. 288, 297, 633 P.2d 921 (1981); State v. Lucas, 167 Wn. App. 100, 111, 112, 271 P.3d 394 (2012), overruled on other grounds by State v. Mohamed, 186 Wn.2d 235, 247-48, 375 P.3d 1068 (2016); State v. Jones, 12 Wn. App. 2d 677, 686, 459 P.3d 424 (2020). As this court stated previously in the context of a harmless error analysis,

> Because credibility determinations cannot be duplicated by a review of the written record, at least in cases where the defendant's exculpating story is not facially unbelievable, this court is not in a position to say, beyond a reasonable doubt, that any reasonable jury would have reached the same result, absent the prejudicial error committed.

State v. Gutierrez, 50 Wn. App. 583, 591, 749 P.2d 213 (1988).

For this reason, the majority's reasoning that "the jury had ample evidence other than the shirt photos to assess Bellerouche's word against Robinson's" is off the mark. Majority at 15; see, e.g., Gower, 179 Wn.2d at 857-58 ("Because credibility was the main issue in this case, … we cannot say [erroneous] admission of that evidence was harmless."). The determination of the photos' harmlessness is not based on the jury

otherwise having sufficient evidence to convict Bellerouche of the charges against him, see Grower, 179 Wn.2d at 857, but whether the prejudicial effect of the photos is insignificant as compared to overwhelming evidence as a whole. See Bourgeois, 133 Wn.2d at 403. That is categorically not the case in a credibility contest such as this.

Furthermore, the majority's comparison of the role of the Hennessy T-shirt photos in Bellerouche's trial with the images in Salas, 1 Wn. App. 2d 931 is misguided. See majority at 13. In Salas, this court held that an image of Salas next to the victim with captions labelling Salas as a football player and the victim as a musician evoked high school stereotypes and "made the visual point that Salas was dangerous" and the victim was meek. 1 Wn. App. 2d at 945-47. The court observed that because the slides were presented at closing, they "were among the jurors' final impressions of the case." Id. at 947. Because the photos of Bellerouche were not similarly contrasted or emphasized during closing, the majority concludes the photos did not have any material effect on the jury's verdict. Majority at 14-15. The majority observes that the T-shirt "photos were only briefly referenced by the State in front of the jury" and were not displayed or referenced at closing argument. Id. at 14.

The record shows that the photos were displayed and admitted into evidence during the prosecutor's questioning of detective Rurey. The majority overlooks the fact that because the photos were admitted, the jurors could view them as much as they wanted during deliberations. When the photos were admitted, the court granted the prosecutor's request to publish while the prosecutor unnecessarily asked the detective to confirm that Bellerouche was "wearing a 'Hennything is Possible Tonight' t-shirt." After the prosecutor elicited from Bellerouche that he likes cognac, including Hennessy,

64

the prosecutor nonetheless asked him if he was "wearing a Hennessy branded t-shirt."

The majority also does not address that the Salas court's analysis pertained to a general (non-race-based) prosecutorial misconduct[51] allegation, not an evidentiary challenge. See 1 Wn. App. 2d at 938-47. To this end, the majority again disregards the established rule that, in the context of a trial that reduced down to whether the jury believed the defendant or the victim, the erroneous admission of evidence cannot be harmless. See State v. Gauthier, 174 Wn. App. 257, 270-71, 298 P.3d 126 (2013). This is not equivalent to the analysis the Salas court conducted to determine whether the prosecutor's conduct "deliberately appealed to the jury's passion and prejudice" so as to "encourage[] the jury to base the verdict on the improper argument." Salas, 1 Wn. App. 2d at 946 (emphasis added).

As such, the majority's analysis conflates the issue of the photos' prejudicial effect with that of whether their erroneous admission was harmless in the context of Bellerouche's trial. See majority at 14-15. In doing so, the majority mistakenly allows the facts and circumstances of Salas to wash out the substantive rule it stands for as to the use of visual tools. That is, that images "may not be used to inflame passion and prejudice" or "communicate[] what the prosecutor could not … argue aloud." Salas, 1 Wn. App. 2d at 944-45, 945-47; see Walker, 182 Wn.2d at 468.

Here, the photos risked othering or distancing Bellerouche from the jury by portraying him in an unfavorable light. As defense counsel argued below, displaying

---

[51] Under the general prosecutorial misconduct test, a court must determine whether the prosecutor's conduct was both improper and prejudicial in the context of the entire trial. Monday, 171 Wn.2d at 675; Bagby, 200 Wn.2d at 788. A prosecutor's conduct is prejudicial "'only where there is a substantial likelihood the misconduct affected the jury's verdict.'" Monday, 171 Wn.2d at 675 (emphasis and internal quotation marks omitted) (quoting State v. Yates, 161 Wn.2d 714, 774, 168 P.3d 359 (2007)).

Bellerouche in the T-shirt begged jurors to ask the questions of why someone would buy or wear a shirt that objectifies women and what that means. This is exactly the danger that the <u>Salas</u> court was referring to. <u>See</u> 1 Wn. App. 2d at 946-47.

In the context of a credibility contest, it is not possible for this court to say that had the error not occurred, the outcome of the trial would not have been materially different. Accordingly, I would hold that the trial court's erroneous admission of the photos was not harmless and warrants reversal. I therefore respectfully dissent.

CONCLUSION

In sum, I would hold that Bellerouche met his burden in establishing that the prosecutor's use of "beef" in the context of this trial was an apparently intentional appeal to jurors' potential racial bias that could have undermined his credibility or presumption of innocence. I also would hold that the trial court abused its discretion in admitting the December 2020 photos of Bellerouche wearing the "Hennything Is Possible Tonight" T-shirt. Any potential relevance was based on conjecture, and, even if the photos were minimally relevant, such relevance was substantially outweighed by the risk of unfair prejudice. Given that the jury's determination of whether Bellerouche was the shooter turned on a credibility contest, the erroneous admission of the photos cannot be harmless. Either error warrants reversal of Bellerouche's conviction. Accordingly, I would reverse both convictions and remand for a new trial.

Coburn, J.